In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2933

Martha Sanville, individually and as
trustee for the heirs and next of kin
of Matthew A. Sanville, deceased,

Plaintiff-Appellant,

v.

Gary McCaughtry; Jane Gamble; Curtis Bender;
Ivy Scaburdine (f/k/a Ivy Podish); Eric
Schroeder; Glenn Gilgenbach; Jodine Deppisch; Narinder
Saini, Ph.D.; Gary Ankarlo, Ph.D.; Stephen
J. Fleck, Ph.D.; Yogesh Pareek, Ph.D.; Carl
L. Cihlar, Ph.D.; John Does Nos. 1-5, all
in their individual and official
capacities,

Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Wisconsin, Milwaukee Division.
No. 99 C 715--Rudolph T. Randa, Judge.

Argued February 13, 2001--Decided September 21, 2001


  Before Manion, Kanne, and Evans, Circuit
Judges.

  Kanne, Circuit Judge.  Matt Sanville, a
mentally ill inmate incarcerated at the
Waupun Correctional Institution in
Wisconsin, committed suicide when he was
left unsupervised for approximately five
hours. His mother, Martha Sanville, filed
this lawsuit in federal district court,
alleging that a number of prison
officials violated Matt's Eighth
Amendment rights through their deliberate
indifference to Matt's/1 serious medical
needs. While we affirm the district
court's dismissal of plaintiff's claims
against the prison wardens and the
medical professionals who treated Matt,
we find that Mrs. Sanville has pleaded
sufficient facts to survive a motion to
dismiss her complaint against several
prison guards. We thus affirm in part and
reverse in part, and remand the remaining
claims for further proceedings.

I.  History

Matt Sanville suffered, as do a significant number of prison inmates, from a serious mental health problem. At various times in his life, doctors diagnosed Matt with major depressive disorder, aggressive conduct disorder, bipolar disorder, dysthymic disorder, adjustment disorder, mixed personality disorder, and manic depression. While they might have disagreed as to Matt's precise medical condition, the doctors unanimously agreed that Matt needed to be medicated to control his illness. His adult life was characterized by a history of suicide attempts, hospitalizations, and drug treatments directed towards managing his multiple mental disorders.

Matt did not agree that he needed to be medicated and, during an unmedicated period in July 1997, he was arrested for assaulting his mother. When prosecutors charged Matt with assault, his court-appointed attorney moved for a competency evaluation, which the state judge ordered. The medical professional who examined Matt, Harlan R. Heinz, Ph.D., concluded that he was "significantly depressed and acutely psychotic, rendering him incompetent to stand trial." He also found that Matt 1) "showed significant lack of insight by reporting his thinking was fine," 2) "was not able to make his needs known," and 3) was "not competent to refuse medication or treatment for his mental condition." Matt's attorney agreed with this assessment and prepared an incompetency defense.

Matt, however, would not admit his incompetency, and his first attorney withdrew as a result. Matt's second attorney acceded to Matt's assessment of his own competency and Matt was allowed to plead no contest to the battery charge. His presentence investigation report noted that Matt had received thirty conduct reports during his confinement--for such infractions as covering his cell light, plugging toilets, and throwing feces and urine on staff--all of which occurred while he was not medicated. At sentencing on January 5, 1998, Matt's mother pleaded with the court not to send Matt to prison, asserting that he was not a danger as long as he was medicated. The prosecutor concurred, stating that he disagreed with

the PSI's recommendation that Matt should go to prison--he even went so far as to note that "I do not believe that sending a person to the Wisconsin State Prison system is the best place to deal with a person's mental illness." Although the Judge noted that Matt was probably mentally ill, he sentenced him to the maximum term in prison. Matt began serving his sentence at the Dodge Correctional Institute (hereinafter "Dodge") on January 7, 1998.

Mrs. Sanville wrote a letter to the evaluator at Dodge explaining that Matt's conduct was the result of mental illness and relaying the opinions conveyed about Matt's mental health during the court proceedings. On Matt's second day at Dodge, Dr. Carl L. Cihlar, the first of the doctor-defendants, performed an intake screening of Matt and incorrectly reported that Matt did not have a mental illness. While noting Matt's history of suicide attempts, the report also stated that Matt had never taken any medication to help with "anxiety, depression, mood swings, thinking problems, hearing voices or seeing things, or controlling [his] behavior." Plaintiff alleges that Dr. Cihlar was aware of Matt's troubled history, including the conclusions of Dr. Heinz's pretrial competency evaluation. Towards the end of the month, Matt was again evaluated, this time by a classification specialist at Dodge, and she determined that Matt was presently medicated with psychotropic drugs. Her report also noted Matt's numerous behavioral problems during his unmedicated stay in the county jail.

Matt arrived at Waupun Correctional Institution (WCI) on February 26, 1998. A week after his admission, Matt was seen for a psychiatric follow-up by Dr. Yogesh Pareek, the second of the doctor-defendants. Because Matt was having problems with nausea and vomiting, Dr. Pareek advised him to go off his psychotropic medication until the problems subsided. As it turned out, Matt had an inflamed appendix, which required an emergency appendectomy on March 6, 1998.

While in the hospital, Matt remained off his medication. On March 10, his mother contacted the hospital to express concern that Matt had been taken off his

medication. After the prison was contacted, the staff physician assured her that Matt's anti-psychotic medication had been reordered.

On March 26, 1998, about a week after his release from the hospital, Matt saw Dr. Pareek for the second time. Dr. Pareek noted that Matt had a "history of psychotic disorder, but he [was] refusing to take medication" and that Matt denied "ever hearing voices or ever seeing things [or] ever being paranoid." The doctor decided to discontinue psychotropic medication "at the patient's request." His notes indicated that he would "see [Matt] again in eight weeks. The patient is competent and he knows what is right and wrong." A week later, however, Matt and Dr. Pareek had another session. Matt had not taken any medication since the date of the appendicitis incident, March 5, and indi cated that he no longer wanted medication or psychiatric services. Dr. Pareek's treatment plan stated "I will not schedule him as he is not taking any medication and he does not want to."

While he was unmedicated, Matt's behavior became increasingly bizarre. In April, he defied an order to return to his cell, for which he was sent to solitary confinement. In early May, he scrawled venomous, nonsensical threats on his bed sheets ("kill the rapest [sic] and snitches" and "go to hell"). On June 9, he flushed his socks and underwear down the toilet. Yet he also displayed some evidence of competence (perhaps consistent with his diagnosis that he exhibited "very paranoid behavior with sense of reality"). The day prior to the sock flushing incident he requested that he be placed in an anger management class (he was placed on a waiting list). He also filed a lawsuit based upon the failure of one correctional officer to respond to his requests for medical attention during the appendicitis incident.

In late June, Matt asked to see a psychiatrist. When Dr. Pareek arrived, Matt reported no mental health concerns and persisted in his decision to remain off his medication. Dr. Pareek provided neither treatment nor medication to Matt. At this point, Matt had lost seventeen pounds since his admission to WCI.

On July 11, 1998, Matt assaulted another inmate and was placed in segregation. Just prior to being placed there, Matt drafted a document that he entitled his last will and testament. This document--collected by correctional staff at an undetermined time--was addressed to Matt's mother and contemplated Matt's imminent death.

While in segregation, Matt's bizarre behavior continued. After receiving conduct reports for refusing to return his meal tray and bag lunch, Matt was served "nutri-loaf"--a meal ground up into a loaf that could be eaten without utensils. He did not eat these loaves and thus began to lose weight rapidly. His subsequent autopsy confirmed that he lost about forty-five pounds during his five months at WCI, nearly twenty-five of which were in the final month of his life (after his placement in segregation). Matt wrote to his mother and complained about the nutri-loaf;/2 upon receipt of the letter, she called the manager of the Health Services Unit at WCI and relayed her concern that Matt was paranoid, suicidal, and in serious trouble.

On July 24, 1998, Dr. Stephen Fleck, the third doctor-defendant, visited Matt in his cell in response to Mrs. Sanville's phone call. Dr. Fleck was, however, satisfied with Matt's insistence that he had no plans to harm himself. Matt again refused clinical and psychiatric services. Dr. Fleck's report did not make any reference to Matt's weight.

Matt repeatedly asked the guards to bring him a regular meal but his requests were ignored. He reported to many prison employees that he was unable to eat the nutri-loaf. His failure to eat and his corresponding weight loss was allegedly known to, at a minimum, the prison guards who fed him (including defendant Ivy Scaburdine).

Matt mailed a letter to his mother on July 27, 1998, which prison officials read. The letter conveyed that Matt thought he was being retaliated against because of the lawsuit that he had filed, asked for help in finding an attorney, requested clinical services, and again told Mrs. Sanville that he was not eating the nutri-loaf. That same day Matt requested to see someone from clinical

services, and Dr. Fleck visited him at his cell. Dr. Fleck's report indicated that Matt said his mood was not good but that "[h]e denied any thoughts and plans to harm himself . . . ." The notes continued:

I again recommended a face-to-face. He again refused, stating "I can take care of myself." I again suggested he put in an interview request to see Y. Pareek, M.D., Psychiatry, to discuss the option of medication. He stated, "I don't need any drugs, I'm handling it myself." . . . I will follow up in four to six weeks to monitor his status.

Later the same day, Matt again requested to see someone from clinical services. Dr. Fleck received this request on July 28, and scheduled an appointment for July 30, 1998, three days after the request. Matt told prison guards sometime during these two days that he was going to kill himself, but no action was taken.

On July 29, 1998, the day of Matt's suicide, correctional officer Ivy Scaburdine, one of the guard-defendants, made her morning rounds to pass out breakfast. Matt had covered all of the openings in his cell with paper--the vents, the call box, and the window--so that it was nearly impossible to see inside. This was in violation of prison policy. Scaburdine did not serve Matt breakfast, instead skipping his cell and continuing on her rounds. When she made the rounds to serve lunch, Matt's window was still covered, thus she did not serve him at that time either. All of the defendant guards observed Matt's covered cell window at some point during the day, but none took any action.

While his cell window was covered, Matt ripped his pillowcase into strips, wet the strips in his sink, and then tied the strips together, thus fashioning a noose. He slid the noose around his neck and tied it to the handicap railing along the west wall of his cell. He managed to position himself so that his weight would pull the noose tighter until he gradually lost consciousness and died.

At approximately 2:48 p.m., correctional officer Eric Schroeder, one of the guard-defendants, was making his rounds. When he passed Matt's cell he noticed that

"inmate Sanville was sitting on his floor in his cell up against the left wall of his cell with the left side of his body against the wall." He further noted that "[Matt] had his window partially covered with toilet paper making it somewhat difficult to see into his cell." Schroeder, who was not regularly assigned to the segregation unit, decided not to take any action. He had been instructed that he should assume inmates who ignored him were simply refusing supplies.

Schroeder claims that he returned to Matt's cell at 2:57 p.m. with officer Glenn Gilgenbach, another guard-defendant. Gilgenbach offered Matt his dinner several times and Matt did not respond. Schroeder wrote in his report that "I then went to the window and observed that he hadn't moved since supplies were offered, nine minites [sic] ago." Schroeder then attempted to call the sergeant for the segregation block, Ann Ingolia, but was unable to reach her because the battery in his radio was dead.

At approximately 3:00 p.m., Schroeder left to retrieve Ingolia. Ingolia followed Schroeder to the door of the cell, peered inside, and noticed that Matt had a sheet around his neck. She instructed Gilgenbach and Schroeder to continue feeding the other inmates while she called Captain Don Strahota to alert him to a possible suicide. Ingolia then returned to the cell to wait for the first responders. Upon arrival, they attempted unsuccessfully to revive Matt. At 3:10 p.m., rescue efforts ceased and Matt was pronounced dead. Matt was last seen alive by the defendants at 10:00 a.m.

The prison file provided to the doctor who performed the autopsy indicated "a past history of suicide attempt" and further disclosed that, as of February 7, 1998, Matt was "psychotic but in remission with a Navane treatment." Matt's weight was estimated at 110-120 pounds. The autopsy concluded that "[a] diagnosis of suicide is reasonable but it sure would have been nice to have him more persuaded to take medication and seek psychiatric help."

Mrs. Sanville filed this lawsuit in the United States District Court for the

Eastern District of Wisconsin on July 25, 1999, raising federal claims under 42 U.S.C. sec. 1983-- alleging that the various defendants violated Matt's Eighth Amendment rights--and pendent state law negligence and medical malpractice claims. The defendants moved to dismiss the action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and filed a corresponding motion for a protective order prohibiting discovery until the court ruled on the motion to dismiss. On June 29, 2000, the court granted defendants' motion to dismiss the federal claims on qualified immunity grounds and declined to retain jurisdiction of the ancillary state law negligence claims. See Sanville v. McCaughtry, No. 99-C-715, slip op. (W.D. Wis. June 28, 2000). Plaintiff appeals this judgment.

## II.  Analysis

### A.  Standard of Review

We review dismissals under Rule 12(b)(6) of the Federal Rules of Civil Procedure de novo, examining a plaintiff's factual allegations and any inferences reasonably drawn therefrom in the light most favorable to the plaintiff. See Marshall-Mosby v. Corporate Receivables, Inc., 205 F.3d 323, 326 (7th Cir. 2000). Dismissal under Rule 12(b)(6) is proper only if the plaintiff could prove no set of facts in support of her claims that would entitle her to relief. See Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957); Veazey v. Communications & Cable of Chi., Inc., 194 F.3d 850, 854 (7th Cir. 1999). "[I]f it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate." Veazey, 194 F.3d at 854 (citing Graehling v. Village of Lombard, Ill., 58 F.3d. 295, 297 (7th Cir. 1995)).

The district court ruled that the defendants were entitled to qualified immunity. See Sanville, slip op at 31. "Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." See

Campbell v. Peters, 256 F.3d 695, 699 (7th Cir. 2001) (citing Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). We review a district court's grant of qualified immunity de novo. See id.

Before we reach the merits of Mrs. Sanville's claims, there are two important issues which we must address, neither of which were discussed by the district court or raised by the parties. Plaintiff alleges that the defendants are liable under 42 U.S.C. sec. 1983, which "requires proof that the defendants were acting under color of state law and that the defendants' conduct violated the plaintiff's rights, privileges, or immunities secured by the Constitution or laws of the United States." Chavez v. Ill. State Police, 251 F.3d 612, 651 (7th Cir. 2001) (quotation omitted). Mrs. Sanville sued each of the defendants in their official and individual capacities, and the district court dismissed all of these claims based upon the doctrine of qualified immunity. Sanville, slip op. at 31. The dismissal of the official capacity claims was not proper, as "it is well established that the qualified immunity doctrine does not apply to official capacity claims." Ruffino v. Sheahan, 218 F.3d 697, 700 (7th Cir. 2000).

Yet there is another twist. Official capacity suits are actions against the government entity of which the official is a part. See Wolf-Lillie v. Sonquist, 699 F.2d 864, 870 (7th Cir. 1983). To sue the defendants in their official capacities means that Mrs. Sanville is really suing the state entities: the Waupun Correctional Institution and the Dodge Correctional Institution./3 As we have recognized previously, however, "section 1983 does not authorize suits against states." Power v. Summers, 226 F.3d 815, 818 (7th Cir. 2000). We conclude, therefore, that the official capacity claims seeking money damages from the defendants should have been dismissed on the basis that they may not be sustained under sec. 1983.

We thus turn to the remaining claims-- the individual capacity claims to which the defendants asserted qualified immunity as a defense. The court must first decide whether the plaintiff's factual allegations would, if proven,

"show the state actor's conduct violated a constitutional right." Billings v. Madison Metro. Sch. Dist., 259 F.3d 807, 816 (7th Cir. 2001) (citing Saucier v. Katz, 121 S. Ct. 2151, 2156 (2001)). If so, then we proceed to the second step of the analysis, which is to determine "whether the right was clearly established." Id. In line with this framework, we begin by reviewing plaintiff's substantive claim that the defendants violated Matt's Eighth Amendment rights; where necessary, we will proceed to consider whether those rights were clearly established at the time of the violation.

B.  Did the Defendants' Conduct Violate Matt's Eighth Amendment Rights?

Prison officials have a duty, in light of the Eighth Amendment's prohibition against cruel and unusual punishment, to "ensure that inmates receive adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). To determine whether an inmate's Eighth Amendment rights were violated by a deprivation, we examine the allegedviolation both objectively and subjectively. See id. at 834. "First, the deprivation alleged must be, objectively, sufficiently serious." Id. (quotation omitted). Second, the mental state of the prison official must have been "one of deliberate indifference to inmate health or safety." Id. (quotation omitted).

Plaintiff alleges, essentially, that the conditions of Matt's incarceration were such that there was a substantial risk that Matt would commit suicide and that the defendants were deliberately indifferent to this risk. When a claim is based upon the failure to prevent harm, in order to satisfy the first element the plaintiff must show that the inmate was "incarcerated under conditions posing a substantial risk of serious harm." Id. It goes without saying that "[s]uicide is a serious harm." Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261 (7th Cir. 1996) (quotation omitted); see also Estate of Novack ex rel. Turbin v. County of Wood, 226 F.3d 525, 529 (7th Cir. 2000); Hall v. Ryan, 957 F.2d 402, 406 (7th Cir. 1992) (recognizing that prisoners have a constitutional right "to

be protected from self-destructive tendencies," including suicide) (citing Joseph v. Brierton, 739 F.2d 1244 (7th Cir. 1984)). In this case, not only was there a risk of serious harm but that harm actually materialized--Matt committed suicide. It would be difficult to think of a more serious deprivation than to be deprived of life, and thus plaintiff's claim clearly satisfies the first element. Cf. Reed v. McBride, 178 F.3d 849, 852 (7th Cir. 1999) ("A condition is objectively serious if failure to treat it could result in further significant injury or unnecessary and wanton infliction of pain.") (internal quotation omitted) (collecting cases).

We should note that the injury could be framed in a more particularized fashion with respect to the various groups of defendants. The need for a mental illness to be treated could certainly be considered a serious medical need. See id. at 853 (citing Hudson v. McHugh, 148 F.3d 859, 863 (7th Cir. 1998), for the proposition that unmedicated epilepsy "posed a 'serious threat' to a prisoner's health"). Further, there is the additional possibility that Matt was physically unable to eat the nutri-loaf that he was being served (the complaint states both that he refused his food and that he was unable to eat it). We have held that withholding food from an inmate can, in some circumstances, satisfy the first Farmer prong. See id. (recognizing that "the amount and duration of the deprivation" would be relevant to whether the deprivation amounted to an objective violation of the Eighth Amendment). Whether these facts would support a finding that Matt was denied food is not something we need to resolve, as we have already concluded that Matt demonstrated a serious medical need.

We therefore turn to the second element of the Farmer framework: whether the defendants were deliberately indifferent to the risk that Matt would commit suicide. See Pardue, 94 F.3d at 261. The meaning of the "deliberate indifference" prong has recently been clarified by the Supreme Court: "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an

excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. With this framework in mind, we consider Mrs. Sanville's claims against the various defendants.

1.  The Medical Defendants: Cihlar, Pareek, Fleck/4

Plaintiff alleges that the doctors knew that Matt's refusal to accept care was a symptom of his mental illness and that by deferring to his stated wishes, they deliberately disregarded the substantial risk that he would commit suicide. Thus, because they allowed him to remain unmedicated without taking further precautions to ensure his safety, plaintiff alleges that the doctors were deliberately indifferent to Matt's serious medical need.

This situation is undeniably tragic. Yet "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). To avoid dismissal, Mrs. Sanville must plead sufficient facts to demonstrate that a fact-finder could infer deliberate indifference from the doctors' treatment decisions. "[D]eliberate indifference may be inferred . . . when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." Pardue, 94 F.3d at 261-62. We examine Mrs. Sanville's claims against each of the doctor-defendants in turn.

Plaintiff asserts that Dr. Cihlar, during the screening interview at Dodge, incorrectly found that Matt did not have a mental health illness and that he was not medicated with anti-psychotics. While Dr. Cihlar's conclusions about Matt's mental health may have been negligently drawn, stating that Matt did not have a mental illness does not establish deliberate indifference to Matt's

condition. To violate the Eighth Amendment the official must knowingly disregard a substantial risk to inmate health or safety, see Farmer, 511 U.S. at 837. Not noticing that an inmate exhibits a serious medical need does not violate the Constitution because not noticing that a need exists is not considered "punishment" under relevant Supreme Court precedent. See id. at 837-38./5 Further, we note that his failure to recognize Matt's condition did not prevent Matt from getting subsequent treatment for his mental illness.

Mrs. Sanville accuses Dr. Pareek and Dr. Fleck of failing to provide treatment and medication to Matt even though they were aware of Matt's history of mental illness, which was well-documented in his base file at WCI. She also claimed that they knew that Matt was incapable of making his own decisions regarding medication and that he had a history of asking for help and then denying any need for it. Dr. Pareek advised Matt to discontinue taking his medication--based upon his professional judgment that the medicine was causing Matt's stomachaches--and later determined that Matt was competent and did not need to be medicated. While plaintiff takes issue with the correctness of these decisions, a complaint that a physician negligently treated Matt's mental illness does not state a valid Eighth Amendment medical mistreatment claim. See Estelle, 429 U.S. at 107. Plaintiff thus asserts that advising Matt to stop taking his medication was such a substantial departure from accepted professional judgment that a jury could infer deliberate indifference. To determine whether this is the case, we ask whether a minimally competent doctor in Dr. Pareek's shoes would have been aware of a substantial risk that allowing Matt to remain unmedicated would result in serious harm. See Pardue, 94 F.3d at 262-63. Here, we cannot find that the risk was such that Dr. Pareek's actions were deliberately indifferent. Matt saw Dr. Pareek on March 5, March 26, April 2, and in late June of 1998. The last of these dates was over a month before Matt committed suicide. In April, Matt stated that he no longer wanted medication or psychiatric services, and Dr. Pareek deferred to those wishes. At the time of Dr. Pareek's June visit, Matt had been

off his medication for three months (since March 5) and there is no indication that Matt was, at that time, suicidal or in danger of harming himself. Recognizing that "a medical professional must consider [an inmate's] conflicting rights," Dr. Pareek seemingly determined that Matt's desire to be free from medication outweighed his right (or need) to receive psychotropic drugs for his mental illness. See Pardue, 94 F.3d at 262 (noting that an inmate had both an Eighth Amendment right to be restrained so that he would not injure himself and a Fourteenth Amendment right to be free from restraint).

Although we wish Dr. Pareek could have prevented Matt's suicide, physicians do not practice with a crystal ball in hand. We thus conclude that plaintiff has not presented evidence from which a trier of fact could find that Dr. Pareek was deliberately indifferent to the substantial risk that Matt would commit suicide. See Farmer, 511 U.S. at 837.

Finally, we turn to Dr. Fleck. Dr. Fleck saw Matt two times in the days immediately preceding Matt's suicide, and his notes indicate that he was concerned about Matt's welfare. He recommended that Matt come in for a face-to-face visit and that he see Dr. Pareek to discuss the option of medication. Matt responded by stating: "I don't need any drugs, I'm handling it myself." Mrs. Sanville points out that Matt was dangerously underweight at the time of Dr. Fleck's June 27, 1998 visit. She alleges that, by deferring to the opinion of a mentally ill and suicidal inmate, Dr. Fleck abdicated his professional judgment and that, at the least, he should have taken extra precautions with regard to Matt's health and well-being. These claims are undeniably emotionally appealing. That a doctor would defer to the discretion of a mentally ill inmate may be troubling to a layperson, particularly when the doctor appeared to recognize that Matt needed to be medicated. And we would hope that additional precautions would have been taken if they were thought to be necessary. Plaintiff has not provided us with any reason, however, to find that Dr. Fleck's choices were not made in the exercise of his professional judgment. While Mrs. Sanville would have preferred the doctor to be less deferential to

Matt's requests and more forceful in pursuing the option of medicating him, we agree with the district court that Dr. Fleck's actions and medical notes counsel against a finding of deliberate indifference. Sanville, slip op. at 21.

In sum, the evidence does not support a finding that the medical professionals at WCI were deliberately indifferent to Matt's serious medical needs. He was seen by medical professionals eleven times over the five months that he was incarcerated and most of these visits took place shortly after they were requested. Plaintiff points to Dr. Flick's failure to see Matt promptly after his July 27th request, yet Dr. Flick had already seen Matt once that day. There is no indication that the doctor was aware that Matt was suicidal or in serious harm at that time (if, in fact, Matt was suicidal at that time). Further, Dr. Flick did not even receive the request until July 28th, at which time he scheduled Matt for an appointment on July 30th. Under the circumstances, this delay cannot be considered deliberately indifferent. See Gutierrez v. Peters, 111 F.3d 1364, 1374 (7th Cir. 1997) (finding no deliberate indifference where the inmate "repeatedly received treatment over [a] ten-month period and that at most he experienced an isolated occasion or two where he did not receive prompt treatment"); cf. Reed, 178 F.3d at 855-56 (distinguishing prior Seventh Circuit cases where "the totality of the [inmate's] medical care" counseled against a finding of deliberate indifference, and holding that the court was faced with one of those instances in which "mistreatment for a short time would be evidence of a culpable state of mind") (quotation omitted).

It is troubling that this young man's suicide might have been prevented had he been taking his prescribed psychotropic medication. The ultimate problem seems to be that none of the doctors ever noted that Matt might be a suicide risk, an observation that would not have seemed too obscure considering his mental illness and history of suicide attempts. Yet the doctors' failure to correctly diagnose and treat Matt is not, in this instance, evidence of anything more than medical malpractice. Though we find that plaintiff's claims against the doctor-

defendants were properly dismissed by the district court, we note that plaintiff is certainly free to pursue her state law medical malpractice claims in state court./6

2.  The Guards: Scaburdine, Schroeder, Gilgenbach, John Does Nos. 1-5/7

   Mrs. Sanville accuses several correctional officers at WCI of knowing that Matt was likely to commit suicide but failing to reasonably respond to this risk. To be liable under the Eighth Amendment for an inmate's suicide, "a prison official must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing this act." Turbin, 226 F.3d at 529 (citations omitted). However, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 842. Whether a prison official had the requisite knowledge is a question of fact. See id. If "the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." Id. 842-43. Prison officials can still show that they were unaware of the risk--this is a subjective inquiry--or that they were aware of the risk but that they responded reasonably to it, "even if the harm ultimately was not averted." Id. at 844-45. Thus we ask 1) were the prison officials aware of the substantial risk that Matt might take his own life and, if so, 2) did they "take reasonable steps to prevent the inmate from performing this act." Turbin, 226 F.3d at 529.

a.  Awareness of the Substantial Risk

   Plaintiff claims that, once Matt covered his cell openings with toilet paper, the guards were aware of the substantial risk that Matt would commit suicide. She asserts that the guards already knew: 1) that Matt had written a last will and

testament contemplating his imminent death and telling his mother how to carry on his affairs after he died; 2) that Matt told certain guards that he planned to commit suicide; 3) that he had attempted suicide in the past; 4) that he had a long history of mental illness; 5) that he was not eating and was dangerously thin; and 6) that his mother had called the prison to alert them that he was paranoid, suicidal, and in trouble.

It seems quite possible that, under the facts as alleged by the plaintiff, the guards could have been aware of the risk that Matt would commit suicide. Particularly if Matt told them that he was suicidal, that alone should have been enough to "impute awareness of a substantial risk of suicide." Turbin, 226 F.3d at 529. It is true that "strange behavior alone, without indications that that behavior has a substantial likelihood of taking a suicidal turn, is not sufficient to impute subjective knowledge of a high suicide risk to jail personnel." Id. at 530. Thus, if the inmate was a normally functioning individual with no history of mental illness or suicide attempts, who had not recently lost nearly one-third of his body weight or written letters to his mother contemplating his death, then maybe papering up his cell would not be enough to put the guards on notice that something was wrong. Matt was not a normally functioning individual, however, and it would not be inconsistent with the alleged facts to find that he did "put jail officials on notice that there was a significant likelihood that he would attempt to harm himself." Id. The Eighth Amendment does not allow officials to turn a blind eye to the activities of an inmate, particularly one who is suicidal. We thus find that plaintiff's complaint should not have been dismissed because she has alleged sufficient facts that, if proven, would entitle her to relief against the WCI guards. See Hall, 957 F.2d at 405 (finding that plaintiff raised a genuine issue of material fact regarding the defendants' knowledge of Howard's suicidal tendencies); cf. Turbin, 226 F.3d at 534 (Williams, J., dissenting) ("[W]e have more than Novack's strange and bizarre behavior. We also have evidence that jail officials knew that Novack was a suicide risk and had a possible mental illness.").

Defendants contend that they were not aware of any risk that Matt would harm himself, and assert that plaintiff cannot survive the first Farmer prong. We find their arguments unconvincing. First, defendants contend that the only way the guards would have known many of these facts is if they had read Matt's prison file, which they characterize as an unreasonable endeavor. While we do not need to address whether the guards should be familiar with the mental health histories of the prison's inmates, it seems contrary to defendants' assertions that the guards could have been aware of many of the facts alleged by plaintiff without reading Matt's file (for example: that Mrs. Sanville had called the prison to express concern over Matt's condition, and that Matt had written a last will and testament, lost a significant amount of weight, and said that he planned to commit suicide). Second, defendants allege that the fact that Matt was requesting food other than the nutri-loaf and that he had filed a complaint the week before his suicide indicates that the guards would not have thought that Matt was a substantial suicide risk. What the guards thought, however, is not an issue for us to resolve--it is an issue for a trier of fact. See Farmer, 511 U.S. at 842. Third, the defendants criticize the plaintiff for doing nothing more than alleging facts. Yet, under the requirements of notice pleading, Mrs. Sanville does not have to prove her factual and legal allegations at this stage, she need only show that relief is possible. See Conley, 355 U.S. at 45-46; Bartholet v. Reishauer A.G. (Zurich), 953 F.2d 1073, 1078 (7th Cir. 1992). Plaintiff has certainly met this standard. Of course, this is not the end of the inquiry. During discovery, the parties will undoubtedly explore in greater detail whether the "prison official[s] had the requisite knowledge of a substantial risk" to Matt's health. Farmer, 511 U.S. at 842.

b.  Whether the Defendants Took Reasonable Steps

While it remains to be seen whether the defendants were actually aware of the substantial risk to Matt's health, there seems to be no evidence that the defendants "[took] reasonable steps to

prevent the inmate from [committing suicide]" as is required by our case law. Turbin, 226 F.3d at 529. Matt was last seen alive by the defendants at 10:00 a.m. In the five hours during which Matt's cell window was covered with toilet paper, there was no apparent attempt to discern whether he was stable. The guards did not use the video camera to check on Matt, nor did anyone take any action until approximately 3:00 p.m. If the defendants were aware of the alleged risk, failing to determine what was going on in Matt's cell could easily be considered egregious enough to rise to the level of deliberate indifference. The evidence here clearly supports an inference that at least some of the guards, if not all of them, were aware of Matt's serious medical need and demonstrated deliberate indifference to that need.

There are a number of reasons why defendants assert that the guards cannot be found liable, none of which we find meritorious. Contrary to defendants' allegations, the fact that we have already found that the doctors cannot be held liable does not erect a legal bar that prevents anyone else in the prison from being held liable. See Estelle, 429 U.S. at 107-08 (finding that the claims against the doctor defendants amounted, at most, to medical malpractice, but remanded to the Court of Appeals for consideration of "whether a cause of action has been stated against the other prison officials" including the prison warden). Defendants further assert that the guards cannot be held liable because they relied upon the doctors' determination that Matt was not a suicide risk. The record, however, at least as currently developed, does not support this assertion. There is no evidence indicating that any of the doctors actually determined that Matt was not suicidal, much less that they then informed the guards that Matt was not suicidal and that the guards then decided not to act based on that information. Our review is intended to determine whether the plaintiff could prevail under any set of facts, not whether the defendant could win under any set of facts. Likewise, the fact that Matt was seen by mental health professionals eleven times during his incarceration does not prevent us from finding that someone--whether a guard or

a warden or otherwise--was deliberately indifferent to his serious medical needs. The guards' liability is not premised upon the acts or omissions of the medical professionals, it is premised upon their own deliberate indifference to Matt's condition.

We will thus consider, subsequently, whether this was a clearly established law at the time of defendants' actions to determine whether this claim should be reinstated. We first turn to consider plaintiff's claims against the final group of defendants--the wardens.

3.  The Wardens: Warden Gary McCaughtry, Deputy Warden Jane Gamble

Mrs. Sanville alleges that the wardens failed to adopt and enforce adequate suicide prevention policies and that they also failed to train and supervise the guards and doctors./8 Because we have already determined that plaintiff's official capacity claims against McCaughtry and Gamble should have been dismissed, we need only consider the claims against the wardens in their individual capacities. The plaintiff faces a substantial challenge because failure to train claims are usually maintained against municipalities, not against individuals, see, e.g., Williams v. Heavener, 217 F.3d 529, 532 (7th Cir. 2000); Kitzman-Kelley v. Warner, 203 F.3d 454, 459 (7th Cir. 2000), and, in the Eighth Amendment context, such claims may only be maintained against a municipality. See Farmer, 511 U.S. at 841 (noting that the standard applied in City of Canton v. Harris, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989), was not "an appropriate test for determining the liability of prison officials under the Eighth Amendment as interpreted in our cases").

The doctrine of respondeat superior does not apply to sec. 1983 actions; thus to be held individually liable, a defendant must be "personally responsible for the deprivation of a constitutional right." Chavez, 251 F.3d at 651 (quotation omitted); see also Wolf-Lillie, 699 F.2d at 869 ("Section 1983 creates a cause of action based upon personal liability and predicated upon fault."). A defendant "will be deemed to have sufficient personal responsibility if he directed

the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." Chavez, 251 F.3d at 652. This definition recognizes that the individual does not have to have participated directly in the deprivation. See McPhaul v. Board of Comm'rs of Madison Co., 226 F.3d 558, 566 (7th Cir. 2000) (quotation omitted). Thus, a supervisor may be liable for "deliberate, reckless indifference" to the misconduct of subordinates. See Chavez, 251 F.3d at 651. ("The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.") (quotations omitted).

Mrs. Sanville accuses defendants of tolerating a number of transgressions which she contends rose to the level of systematic failure: 1) on four separate occasions, three guards ignored the paper on Matt's cell; 2) the camera in his cell was not active the entire three weeks he was in segregation; 3) Matt lost nearly one-third of his body weight while in segregation; and 4) the guards allegedly received no suicide prevention training. None of these allegations, however, suggest that the wardens were personally responsible for any deprivation. Nor does plaintiff allege that they "turned a blind eye" to any particular conduct of the remaining defendants. We thus agree with the district court that plaintiff has alleged no facts that would support a finding of liability with respect to the wardens.

C.  Was the Right Clearly Established at the Time of the Violation?

We must now consider whether the guards may be held liable under sec. 1983, or whether they are entitled to qualified immunity. We have recently set forth the framework for making this determination:

Qualified immunity protects government officials from individual liability under Section 1983 for actions taken while performing discretionary functions, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. Thus, before liability will attach, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

Brokaw v. Mercer County, 235 F.3d 1000, 1022 (7th Cir. 2000) (internal quotation and citations omitted). There can be little debate that it was clearly established, long before 1998, "that prison officials will be liable under Section 1983 for a pretrial detainee's suicide if they were deliberately indifferent to a substantial suicide risk." Hall, 957 F.2d at 406. Further, "[i]t was clearly established in 1986 that police officers could not be deliberately indifferent to a detainee who is in need of medical attention because of a mental illness or who is a substantial suicide risk. Deliberate indifference to a prisoner's medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment." Id. at 404-05. Thus, we find that the guards are not immune from individual liability in this case./9

III. Conclusion

In light of the foregoing analysis, we AFFIRM the district court's dismissal of Mrs. Sanville's Eighth Amendment claims against the doctor-defendants and the wardens, and REVERSE the district court's dismissal of her claims against the guards.

FOOTNOTES

/1 For the sake of clarity, we will refer to Matt Sanville as "Matt," and to Martha Sanville as "Mrs. Sanville."

/2 He wrote a letter to his mom, dated July 23, 1998, stating: "the guards are trying to feed me gag loaf (nasty)--I can't eat it."

/3 We take judicial notice of the fact that both these entities are state prisons: the Waupun Correctional Institution is a state penitentiary and the Dodge Correctional Institution is the correctional treatment center at Waupun. See Wis. Stat. sec. 302.01.

/4 Plaintiff's complaint also challenged the actions of Narinder Saini, Ph.D., and Gary Ankarlo, Ph.D. On appeal, plaintiff did not present analysis with respect to these doctors, thus we do not address them here.

/5 The Supreme Court has rejected the argument that, under the subjective test for deliberate indif- ference, "prison officials will be free to ignore

obvious dangers to inmates." Farmer, 511 U.S. at 842. However, even if a risk is obvious--i.e., even if it was well- documented in Matt's file that he had a mental illness that, if left untreated, would pose substantial risk to his health--the prison official is not liable under the Eighth Amendment if "the obvious escaped him." Id. at 843 n.8

/6 The district court's denial to exercise supplemental jurisdiction over these claims is still appropriate given the disposition of those claims here.

/7 Plaintiff's complaint also challenged the actions of Curtis Bender and Jodine Deppisch. On appeal, plaintiff did not present analysis with respect to these defendants, thus we do not address them here.

/8 The defendants contend that these allegations were not in plaintiff's district court complaint. We found otherwise: both were included in Count I (alleging violations of Matt's Eighth Amendment rights), paragraph 139.

/9 The district court relied upon State Bank of St. Charles v. Camic, 712 F.2d 1140 (7th Cir. 1983), to support its conclusion that the defendants were entitled to qualified immunity. See Sanville v. McCaughtry, No. 99-C-715, slip op. at 14 (W.D. Wis. June 28, 2000). Camic did not address qualified immunity; rather, that case found that the district court's grant of summary judgment was proper because the plaintiff did not raise "a question of material fact as to whether the defendants had knowledge of . . . suicidal tendencies on the part of [the inmate]." Camic, 712 F.2d at 1146.