In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2750

DESTINY HOFFMAN, *et al.*,

*Plaintiffs-Appellants*,

*v.*

SUSAN KNOEBEL, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 14-CV-00012 — **Sarah Evans Barker**, *Judge*.

ARGUED JANUARY 4, 2018 — DECIDED JULY 3, 2018

Before WOOD, *Chief Judge*, and HAMILTON and BARRETT, *Circuit Judges*.

WOOD, *Chief Judge*. Like many jurisdictions, Indiana has turned to "drug courts" to tackle substance-abuse problems more flexibly than traditional sentencing regimes might allow. Ind. Code § 33-23-16-5. These non-traditional court programs have been shown to reduce recidivism rates, at least in some jurisdictions. Compare Michael W. Finigan, *et al.*, IMPACT OF A MATURE DRUG COURT OVER 10 YEARS OF

OPERATION: RECIDIVISM AND COSTS 23–29 (Nat'l Inst. Just.
2007), https://www.ncjrs.gov/pdffiles1/nij/grants/219225.pdf
(analyzing the successes of the drug court in Portland, Ore-
gon, in reducing recidivism), with Randall T. Brown, *System-
atic Review of the Impact of Adult Drug Treatment Courts*,
155 J. LABORATORY & CLINICAL MED. 263, 263 (2010) (finding
that "randomized trials failed to demonstrate a consistent ef-
fect on rearrest rates for drug-involved offenders" participat-
ing in drug treatment courts). Unfortunately, the Drug Treat-
ment Court ("DTC") in Clark County, Indiana, was not one of
the success stories. Under the stewardship of Judge Jerome Ja-
cobi, the court ran roughshod over the rights of its partici-
pants, who frequently languished in jail for weeks and even
months without justification. The jail stays imposed as "sanc-
tions" for noncompliance with program conditions were arbi-
trary and issued without due process. DTC staff made arrests
despite a clear lack of authority to do so under state law. After
these abuses were brought to light, numerous participants in
the program filed a putative class action under 42 U.S.C.
§ 1983, and the Indiana Supreme Court and Indiana Judicial
Center shut down the program.

Indiana's actions may have ended the DTC, but they did
not end the litigation in the district court. That court denied
class certification, dismissed some claims, and resolved most
of the rest of the claims on summary judgment. A final plain-
tiff's claim was settled before trial. In the end, the plaintiffs
failed to win relief. On appeal, we are left with due process
claims by seventeen plaintiffs against three defendants, and
Fourth Amendment claims by three plaintiffs against two de-
fendants. The district court resolved all of these claims in the
defendants' favor at summary judgment. While we have no
doubt that the plaintiffs' constitutional rights were violated,

the question is whether these defendants were personally responsible for the systemic breakdown. Plaintiffs have failed to make that showing, and so the district court's judgment dismissing the action must be affirmed.

**I**

The Clark County DTC was founded in 2002. Like all Indiana drug courts, it was given the task of "bringing together substance abuse rehabilitation professionals, local social programs, and intensive judicial monitoring" to provide "individually tailored programs or services" to its participants. Ind. Code § 33-23-16-5. Participants entered the DTC after pleading guilty to a drug-related felony that otherwise would have led to a prison sentence. As part of each plea deal, the state agreed not to enter a conviction against the defendant in exchange for the defendant's compliance with the conditions of the program. Once a participant entered the program, she would be assigned to one of two case managers, who would create an individualized plan. Plans often required a participant to obtain treatment from approved providers, attend regular DTC meetings and hearings, and retain employment. Participants also were subject to unannounced visits and drug screens and were required to obtain approval for any changes in living arrangement or placements with treatment facilities. As participants progressed through the phases of the program, supervision and reporting became less frequent.

Upon successful completion of the program, a participant's deferred criminal charges were dismissed with prejudice. By contrast, an unsuccessful participant could be "terminated" from the program, meaning, essentially, that she had flunked out. "Terminated" participants had their convictions entered and were sentenced in accordance with their plea

agreement. Before turning to this drastic remedy, the DTC could impose a number of intermediate "incentives, sanctions, and therapeutic adjustments" to bring a participant back on track. IND. PROB. SOLV. CT. R. 27. The available sanctions ranged from assigned reflective essays to more frequent monitoring to short-term jail stays.

The program appears to have proceeded smoothly until Judge Jacobi became the DTC's presiding judge in January 2012. Under his stewardship, the administration of the program went seriously awry. Two troubling practices arose. First, many short-term jail sanctions began stretching beyond anything that fairly could be called "short-term." To take two of the worst examples, Jason O'Connor was jailed 220 days for what was announced in court as a 30-day sanction, and Destiny Hoffman was jailed 154 days for what was announced as a 48-hour sanction. In all, 16 of the plaintiffs advancing due process violations on appeal were jailed 24 times, for periods ranging from 6 to 220 days. These sanctions were imposed without the procedural protections required by Indiana law, such as written notice, a right to counsel, or a right to present evidence. The plaintiffs argue that these extended periods of incarceration violated the Due Process Clause of the Fourteenth Amendment. Second, two DTC staff members personally arrested participants who had violated DTC rules, when they should have asked local police to execute the warrants. Three plaintiffs argue that these seizures violated the Fourth Amendment.

In the district court, the plaintiffs sued nine county employees and entities. Four defendants remain on appeal, three of whom are sued in their individual capacity. Josh Seybold was one of two case managers for the DTC. As case manager,

he was responsible for finding placements in treatment cen-
ters for jailed participants and often served as participants'
first point of contact with the DTC. Susan Knoebel was the
chief probation officer in Judge Jacobi's court and the director
of the DTC. As director, she oversaw the administrative de-
tails of the Clark County DTC, including Seybold's work as a
case manager. Jeremy Snelling was the courtroom's bailiff and
also served as a "field officer" for the DTC. He tracked down
and arrested several of the plaintiffs for violating DTC rules;
Knoebel accompanied him. Finally, Danny Rodden, the Clark
County Sheriff, was sued in his official capacity. We interpret
these claims as claims against the Clark County Sheriff's De-
partment as an entity. See *Kentucky v. Graham*, 473 U.S. 159,
165–66 (1985). The department operated the county jail, which
the plaintiffs say failed to provide constitutionally sufficient
safeguards against unlawful detention.

The district court granted summary judgment in favor of
all four defendants. We assess the district court's decision *de
novo* and review the record just as the district court did—by
taking all disputed facts and competing inferences from the
evidence in the plaintiffs' favor. *Bunch v. United States*, 880 F.3d
938, 941 (7th Cir. 2018). The parties have raised many argu-
ments both on the merits and relating to various immunities,
but we address only those necessary to resolve this appeal.

## II

### A

The Due Process Clause of the Fourteenth Amendment
prohibits the deprivation of "life, liberty, or property, without
due process of law." U.S. CONST. amend. XIV, § 1. The plain-

tiffs argue that Knoebel, Seybold, and the Clark County Sheriff's Department violated those rights by facilitating the DTC's use of jail sanctions. Sixteen of the plaintiffs were jailed for violating conditions of the DTC program in 2012 and 2013: Destiny Hoffman, Jason O'Connor, Nathan Clifford, Joshua Foley, Amy Tuttle, Amanda Campbell, Justin Lanham, Trentney Rhodes, Joanie Watson, Julia Joseph, Jarvis Peele, Katherine Tudor, Ashleigh Santiago, Robert Upton, Michael Campell, and Brandelyn Taylor. Another plaintiff, Shane Bratcher, separately says that Knoebel and Seybold violated the due process clause by extending his time in the DTC program without procedural protections. But because his claim is distinct and he presented no independent argument in the district court or on appeal, any argument he might make is waived. *Williams v. REP Corp.*, 302 F.3d 660, 666 (7th Cir. 2002). We limit our analysis, then, to the due process implications of the jail sanctions imposed by the Clark County DTC.

Each of the 16 plaintiffs was held in the Clark County jail after being sanctioned by Judge Jacobi or a magistrate judge presiding in his stead. The plaintiffs were brought before the DTC for a variety of missteps: failed or diluted drug tests, missed status hearings, and even self-reported drug or alcohol use. Before sanctions were imposed, Indiana law, consistent with the Due Process Clause, required that the accused person be given written notice, "obtain the disclosure of evidence against the individual," "confront and cross-examine witnesses," and be allowed counsel. Ind. Code § 33-23-16-14.5(c); see also *Goldberg v. Kelly*, 397 U.S. 254, 262–63 (1970) ("The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he

may be condemned to suffer grievous loss … .") (internal quotation marks omitted). It is undisputed that none of these procedural protections was actually provided in Clark County; the plaintiffs were never advised of their right to counsel, never received written notices before the hearings, and never presented evidence. Furthermore, once the plaintiffs were "sanctioned" to the county jail, the court orders generally did not give a specific term even if a term was orally mentioned at the hearing. A typical order simply provided that the plaintiffs were to be "held until further order from the Court" without any accompanying explanation or reasoning.

As a result of this opaque process, the plaintiffs were left in the dark. Many of them, including Hoffman, O'Connor, and Amanda Campbell, wrote letters to Judge Jacobi, Clark County magistrate judges, and DTC staff pleading for help or even just for clarity. In some cases, family members called or visited Seybold's office after earlier inquiries proved ineffective. The record reveals that whatever the stated length of the sanction was at the hearing, the plaintiffs remained in jail until Seybold or another DTC staff member was able to obtain placement in a treatment facility. Whatever caused the delays in these placements, there was no justification in Indiana law for jailing the participants while they waited. As the district court concluded, "[i]t was a wholly indefensible system."

Before proceeding, we think it important to pin down the precise type of due process violation alleged in this case. We have said in the past that prolonged detention before receiving a hearing violates the Due Process Clause's substantive component. See, *e.g.*, *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1068–69 (7th Cir. 2012); *Armstrong v. Squadrito*, 152 F.3d 564, 570–71 (7th Cir. 1998). But this case is simpler. The

plaintiffs were not being held pending a hearing because the ostensible hearing already occurred. The problem was that the hearing itself was constitutionally deficient. See, *e.g.*, *Simpson v. Brown Cnty.*, 860 F.3d 1001, 1006 (7th Cir. 2017); see generally *Mathews v. Eldridge*, 424 U.S. 319 (1976) (discussing constitutional standards for hearings that implicate interests protected by the due process clauses).

As we said at the outset, this is enough to show that the plaintiffs were deprived of a liberty interest without due process of law. But who is responsible? In particular, were either the individual defendants (Knoebel and Seybold) or the Clark County Sheriff's Office subject to liability for a constitutional tort? For both sets of defendants, the crucial issue is personal (or departmental) responsibility. Section 1983 imposes liability only on an official who "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; see also *Kuhn v. Goodlow*, 678 F.3d 552, 555–56 (7th Cir. 2012) (noting that "§ 1983 liability is premised on the wrongdoer's personal responsibility"). In other words, the official's act must both be the cause-in-fact of the injury and its proximate cause. *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012).

B

We begin with the individual defendants. The plaintiffs do not argue that Knoebel and Seybold are responsible for the failure to provide due process protections in the first instance. Rather, they argue that both defendants were deliberately indifferent for failing to intervene while the plaintiffs were in jail. "The deliberate indifference standard reflects a mental

state somewhere between the culpability poles of negligence and purpose, and is thus properly equated with reckless disregard." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015). Detainees, who are protected by the Fourteenth Amendment, are entitled to at least as much protection as that given to prisoners, who are protected by the Eighth Amendment, even though some differences exist. *Rosario v. Brown*, 670 F.3d 816, 820–21 (7th Cir. 2012). The plaintiffs in our case argue that Knoebel and Seybold violated their due process rights by (1) failing to place the plaintiffs in treatment facilities or to file the proper paperwork to end jail sanctions, and (2) failing to report obvious due process violations earlier.

Plaintiffs first accuse Seybold (and Knoebel as his supervisor) of failing to secure placements with treatment centers, and thus of extending the plaintiffs' unlawful detentions. But no rational trier of fact could find that Seybold's actions were taken with at least reckless disregard for their impact on plaintiffs' constitutional rights. See *Farmer v. Brennan*, 511 U.S. 825, 835–47 (1994) (explaining constitutional deliberate indifference standard). Seybold's case notes point to numerous contacts with treatment facilities for each plaintiff; and the most frequent response he received from those facilities was that no beds were available for participants. For example, Rhodes was incarcerated on December 3, 2012, for arriving late to a meeting. On December 6, Seybold noted that he had faxed an application to Serenity House, a local halfway house. On December 14, he spoke with Serenity House, which informed him that a bed would open up the next week. Finally, Seybold completed a transport order on December 20 and Rhodes was released the next day. Rhodes's case is typical:

Seybold followed up every week or two with treatment centers for each plaintiff to see when space would become available.

The plaintiffs argue that these contacts were not frequent enough, but they have not told us why the actual frequency was so deficient that it amounted to a due process violation. When liability is predicated on a departure from the norm, we need a baseline of responsible behavior. *Cf. Estate of Cole v. Fromm*, 94 F.3d 254, 262–63 (7th Cir. 1996) (noting that medical care is deliberately indifferent if it amounts to "a substantial departure from accepted professional judgment, practice, or standards"). Here, we have no such baseline: plaintiffs have not produced any evidence to show that Seybold's placement practices were unsound, let alone that they were deliberately indifferent. Perhaps Seybold missed many opportunities to place participants because he checked in with the various treatment facilities too infrequently; but perhaps there simply was not space for the plaintiffs, in which case further calls from Seybold would only have been a nuisance to a busy facility. The record is silent. While evidence may not always be required to show how an official's behavior departed from the norm—some forms of deliberate indifference are plain on their face—this is not one of those cases.

Hoffman and O'Connor separately argue that Knoebel's failure to file petitions to terminate them from the DTC program violated their due process rights. It is true that Knoebel was the person responsible for filing such a petition, which would have notified the prosecutor that charges should be reinstated, and she did not do so. Yet according to Judge Jacobi's testimony, court records showed the petition had been filed, which led the DTC judges and staff to think they were waiting

for the prosecutors to reinstate charges. This procedural confusion left the plaintiffs in jail for just over a year in the aggregate. That is enough, Hoffman and O'Connor say, to show that Knoebel was deliberately indifferent to their plight. As with Seybold's placement practices, however, Hoffman and O'Connor have not told us why any part the defendants played in this unfortunate tale was so egregious that it violated their due process rights. They cannot mean that every bureaucratic slip creates a constitutional violation. In *Arnett v. Webster*, 658 F.3d 742 (7th Cir. 2011), we found that a prison doctor was negligent, but not deliberately indifferent, for failing to follow up on a medication request when he mistakenly thought a request had already been submitted to the Bureau of Prisons. *Id.* at 758. The same distinction is relevant here: Hoffman and O'Connor have failed to present any evidence that would show that Knoebel's alleged errors were more than simple negligence.

The plaintiffs also argue that Seybold and Knoebel were deliberately indifferent for failing to bring an end to the DTC's unlawful incarcerations earlier. But it is clear from the record that Knoebel and Seybold themselves lacked authority to change the DTC's sanctioning practices. While Knoebel had some authority over the administrative policies of the Clark County DTC, neither she nor Seybold had the power to override Judge Jacobi's orders. When the staff and outside lawyers did bring due process concerns to Judge Jacobi's attention, he dismissed them. Knoebel and Seybold had no ability to compel the judge to do otherwise.

Recognizing this, the plaintiffs contend that Knoebel and Seybold should at least have "investigated and made a report of the obvious constitutional violations that were running

rampant in 2012 and pre-November 2013." Seybold eventually did make such a report when he expressed his concerns to Clark County Chief Judge Vicki Carmichael in November 2013, and his report contributed to the eventual revelation of the DTC's abuses. But the plaintiffs say more was required. To be sure, the Constitution imposes an affirmative duty to protect the well-being of those in custody. See *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). And supervisors are liable for constitutional violations if they turn a blind eye or acquiesce to abuses of their subordinates. See, *e.g.*, *Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 869–70 (7th Cir. 2011); *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). The problem is that Knoebel and Seybold were not supervisors of the DTC, and they certainly had no supervisory authority over the judge. They supervised no one but the participants of the program, and no one argues that the plaintiffs were violating their own rights. See *Jones v. City of Chi.*, 856 F.2d 985, 992–93 (7th Cir. 1988) (discussing supervisory liability for the conduct of subordinates). With supervisory liability out of the way, this theory lacks a legal basis. See *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009). The Constitution does not impose a general duty to expose wrongdoing anywhere within a government employee's organization. State law might impose expanded reporting duties on employees such as the defendants, but that would not help the plaintiffs. See *DeShaney*, 489 U.S. at 203. Knoebel and Seybold were not deliberately indifferent for failing to take extra steps once internal efforts were rebuffed.

## C

Trying another tack, the plaintiffs argue that under *Monell v. Department of Social Services of the City of New York*, 436 U.S.

658 (1978), Sheriff Rodden can be held accountable for the deprivation of their due process rights. To establish liability under *Monell*, the plaintiffs must show that an official government policy or custom "is *responsible* for the deprivation of rights." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 306 (7th Cir. 2010) (quoting *Monell*, 436 U.S. at 690). The Sheriff's Department had no involvement with the DTC's deficient hearings. But once they were detained, plaintiffs assert, the sheriff violated their due process rights by failing to adopt policies to bring their unlawful detentions to an end.

The Clark County Jail, however, had several policies in place at the time that conceivably could have safeguarded detainees from wrongful detention. The jail sent a "Weekly Inmate Roster" to the county court listing all the detainees at the jail who had come from the court. Those being wrongfully detained could have complained by using the jail's informal in-house mail system, through which the guards would walk un-stamped mail over to court employees. (The jail and courthouse were housed in the same building.) This system was *ad hoc* and imperfect, but there is evidence in the record of several letters that made it to the appropriate court officials. Failing that, detainees could try the U.S. mail or file a grievance through the jail's internal grievance system, although there is scant evidence that these fallback policies were actually used.

Relying primarily on *Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998), the plaintiffs argue that these policies were constitutionally insufficient to protect against due process violations. In *Armstrong*, the plaintiff turned himself in on a warrant for what he thought would be a same-day bail hearing, but "the sheriff's office misfiled [the plaintiff's] records and held him for 57 days despite his repeated inquiries." *Id.*

at 567. We found that the sheriff was deliberately indifferent for relying solely on a "will call" list of detainees set to go before a judge to prevent unlawful pre-trial detentions, and by refusing to accept grievances. *Id.* at 577–79. The plaintiffs analogize Clark County's Weekly Inmate Roster to the *Armstrong* sheriff's "will call" list, and argue that Clark County "abdicated responsibility" by impermissibly shifting the burden to detainees to end their unlawful detentions. *Id.* at 579.

There are two problems with this theory. First, the plaintiffs in our case were held pursuant to a facially valid court order, whereas Armstrong was held on a warrant. "In Indiana, the sheriff's department (which administers the jail) is … the entity charged with taking those arrested on both civil warrants and criminal warrants to court." *Id.* at 579 (internal citations omitted); see also Ind. Code § 36-2-13-5(a)(1). The sheriff has no analogous duty when a detainee is held pursuant to a court order. In those cases, the statute requires only that the order be enforced. Ind. Code § 36-2-13-5(a)(4) ("The sheriff shall … execute all process directed to the sheriff by legal authority … ."). We have held that it is an "entirely lawful policy" for a sheriff to hold detainees pursuant to a court order, "unless the custodian knows that the judge refuses to make an independent decision or there is doubt about which person the judge ordered held." *Hernandez v. Sheahan*, 455 F.3d 772, 776 (7th Cir. 2006). Here, Judge Jacobi's orders came after a hearing, and nothing on the face of the orders indicated that those hearings were deficient. As in *Hernandez*, "[t]he Sheriff's policy is the norm: ensure *one* hearing and abide by its outcome." *Id.* at 778.

Second, there is considerable evidence that, whatever the defects of the sheriff's policies, they were successful in getting

some complaints to the DTC staff. In making their case against Knoebel and Seybold, the plaintiffs point to many letters that made it into DTC case files from the in-house mail system. This suggests that the sheriff's deputies were transmitting some letters from those in custody to the court. Even if the sheriff's informal policies were flawed, those inefficiencies did not cause the plaintiffs' extended incarcerations and fall short of the "policy or custom of refusing to accept complaint forms" at issue in *Armstrong.* 152 F.3d at 579. The Sheriff's Department followed court orders, as it was required to do, and directed detainees' complaints about those orders to the issuing court. These policies do not support a *Monell* claim.

We can assume that the Clark County DTC's imposition of extended jail "sanctions" without proper hearings ran afoul of both state and federal law. None of the defendants before us, however, violated federal due process norms.

## III

Finally, we consider the Fourth Amendment claims advanced by three plaintiffs: Michael Campbell, Brandelyn Taylor, and Amy Bennett. All three were arrested by Knoebel and Snelling after warrants were issued for violations of DTC rules. The three arrests follow a similar pattern. In each case, Judge Jacobi or another presiding judge issued an arrest warrant for failure to appear at a DTC hearing or drug test. Rather than waiting for local or county police to execute the warrant, Knoebel and Snelling set out in an unmarked county vehicle and tracked down each participant. Both wore badges and carried guns, and in the arrest of Taylor, Snelling yelled "Clarksville Police" as he approached. Snelling then handcuffed each participant and brought him or her back to the

court. The defendants dispute some of these details, but for the purpose of summary judgment they concede that we must accept the plaintiffs' version of events.

Where, as here, the defendants have conceded that a seizure occurred, the only question is whether the "seizure was unreasonable." *Dunn v. City of Elgin*, 347 F.3d 641, 648 (7th Cir. 2003). Campbell, Taylor, and Bennett argue that their arrests were unreasonable because Knoebel and Snelling acted without any state-law authority. Knoebel and Snelling respond that the lack of state-law authority does not make a seizure unreasonable, and in the alternative, they assert that they are entitled to qualified immunity.

Everyone agrees that Knoebel and Snelling lacked any semblance of state-law authority to arrest DTC participants. But, as *Virginia v. Moore,* 553 U.S. 164 (2008), makes clear, that flaw does not show that there was a federal constitutional violation. As the Court held in *Moore*, an arrest based on probable cause, even if prohibited by state law, does not violate the Fourth Amendment. *Id.* at 174–76. Knoebel and Snelling acted pursuant to facially valid state warrants, and so probable cause to support the arrests either existed, or they reasonably believed that it did. See *United States v. Leon*, 468 U.S. 897, 924 (1984) (analogizing good-faith immunity under section 1983 to the good-faith exclusion under the exclusionary rule).

That is not to say that all was well from a broader point of view. The extent to which Knoebel and Snelling exceeded their jurisdiction is quite troubling. Snelling was a bailiff whose arrest powers did not extend past the courthouse doors, and Judge Jacobi testified that he told Snelling not to arrest people. Knoebel had no conceivable basis for arrest authority, though in fairness she did not personally handcuff

any participants. Both defendants misleadingly brought with them indicia of authority—badges, guns, and in one case a call of "police"—when they had no actual authority. But these are all matters of state law: no one argues that any other aspects of the arrest would offend the Fourth Amendment. The warrants were valid, no excessive force was used, and each plaintiff was promptly taken to the DTC. This does not add up to a Fourth Amendment violation.

## IV

We have no doubt that the plaintiffs' constitutional rights were violated during their time as participants in the Clark County DTC. But that is not the question before us. It is whether any of the four defendants can be held liable for those constitutional injuries. The plaintiffs cannot overcome the barriers to recovery against these four defendants. We AFFIRM the judgment of the district court.