In the

# United States Court of Appeals

### For the Seventh Circuit

No. 15-1470

JONI ZAYA,

*Plaintiff-Appellant,*

*v.*

KUL B. SOOD,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 12-CV-1307 — **Jonathan E. Hawley**, *Judge.*

ARGUED OCTOBER 26, 2015 — DECIDED SEPTEMBER 6, 2016

Before WOOD, *Chief Judge*, BAUER and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Joni Zaya broke his wrist while he was an inmate at the Henry Hill Correctional Center in Galesburg, Illinois. The prison physician, Dr. Kul B. Sood, sent Zaya to an off-site orthopedic surgeon who took x-rays, fitted Zaya with a cast, and sent him back to the prison with instructions that he return in three weeks for a follow-up exam and additional x-rays. Dr. Sood didn't follow those

instructions. Instead he waited nearly seven weeks to send Zaya back to the orthopedic surgeon. By that time Zaya's wrist had healed at an improper angle, and two surgeries were required to repair the defect. Zaya then filed this action under 42 U.S.C. § 1983 claiming that Dr. Sood was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. The district court granted Dr. Sood's motion for summary judgment, holding that the doctor's decision to delay Zaya's return to the orthopedic surgeon constituted a mere difference of opinion between two medical professionals. Zaya now appeals.

It is well established that a difference of opinion between two doctors is insufficient to survive summary judgment on a deliberate-indifference claim. But when a plaintiff provides evidence from which a reasonable jury could infer that the defendant doctor disregarded rather than disagreed with the course of treatment recommended by another doctor, summary judgment is unwarranted. Because Zaya has provided such evidence, we reverse and remand for further proceedings.

## I.  Background

On January 14, 2012, Joni Zaya, an inmate at the Henry Hill Correctional Center, injured his left wrist while playing soccer in the prison yard. He was immediately taken to the health-care unit for x-rays and treatment. Two days later Zaya was examined by Dr. Kul B. Sood, a physician and employee of Wexford Health Services, Inc., the private corporation that contracts with the Illinois Department of Corrections to provide medical services to inmates at Henry Hill. After reading Zaya's x-rays, Dr. Sood diagnosed an undisplaced fracture of the left distal radius—in other

words, a broken left wrist. Dr. Sood then arranged for Zaya to be examined by Dr. Kenneth Bussey, an off-site orthopedic surgeon.

Dr. Bussey examined Zaya on January 17 and confirmed Dr. Sood's diagnosis. He placed Zaya in a cast and sent him back to Henry Hill with instructions that he return for a follow-up exam and additional x-rays in three weeks. In his exam notes, which he forwarded to the prison, Dr. Bussey explained why the timing of the follow-up visit was important:

> I will put [Zaya] in a long-arm cast for 6 weeks. I will see him back in 3 weeks and then get a recheck x-ray in the cast to make sure that it is not displaced. If it does, I could still fix it at 3 weeks rather easily. Right now he doesn't need surgical intervention so I will see him back in 3 weeks.

Dr. Sood acknowledged receipt of Dr. Bussey's notes on January 30.

Despite Dr. Bussey's instructions, Dr. Sood waited for nearly seven weeks to send Zaya back for the follow-up exam and x-rays. During that time, Dr. Sood prescribed pain medication when Zaya complained of discomfort and at one point modified Zaya's cast by cutting the fiberglass. On March 1 Dr. Sood removed the cast and x-rayed Zaya's wrist. The x-rays revealed that the fracture was healing at an improper angle. At that point Dr. Sood authorized a follow-up appointment with Dr. Bussey, who examined Zaya on March 6 and determined that surgery would be required for the fracture to heal properly. Zaya subsequently underwent

two operations: one on March 14 to re-break his wrist and insert a metal plate, and another on August 14 to remove the plate.

Zaya filed this suit against Dr. Sood under § 1983, claiming that the more-than-three-week delay in sending him back to Dr. Bussey amounted to deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Dr. Sood moved for summary judgment, arguing that his decision to wait the extra weeks was an exercise of medical judgment. Dr. Sood further maintained that even if his conduct did rise to the level of deliberate indifference, he was entitled to qualified immunity. The district judge accepted that Zaya's fractured wrist was a serious medical condition. However, he concluded that Zaya had not produced evidence from which a reasonable jury could find that Dr. Sood consciously disregarded a known risk by delaying Zaya's return to Dr. Bussey. Accordingly, the judge granted Dr. Sood's motion for summary judgment without reaching the question of qualified immunity. This appeal followed.

## II. Discussion

We review the court's order granting summary judgment de novo, evaluating the record in the light most favorable to Zaya and drawing all reasonable inferences in his favor. *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). "As to materiality, the substantive law will identify which facts are material." *Id.*

The Eighth Amendment provides the substantive law in this case. In *Estelle v. Gamble*, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)) (citation omitted). "To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). The parties do not dispute that a fractured wrist is an objectively serious medical condition, so the only question is whether a reasonable jury could conclude that Dr. Sood was deliberately indifferent to that condition.

## A. The Deliberate-Indifference Standard

Deliberate indifference requires that a defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The standard is a subjective one: The defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference. *Id.* The requirement of subjective awareness stems from the Eighth Amendment's prohibition of cruel and unusual *punishment*; "an *inadvertent* failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 105 (emphasis added). Whether a prison official was subjectively aware of a risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial

evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citation omitted).

Any inquiry into a defendant's mental state is fraught with difficulties, but those difficulties are often amplified when the defendant is a medical professional. We have consistently held that neither a difference of opinion among medical professionals nor even admitted medical malpractice is enough to establish deliberate indifference. *See, e.g., Petties v. Carter*, No. 14-2674, slip op. at 8 (7th Cir. Aug. 25, 2016) (en banc); *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). However, we have also made clear that an inmate need not show that he was "literally ignored" to prevail on a deliberate-indifference claim. *Conley v. Birch*, 796 F.3d 742, 748 (7th Cir. 2015) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). A doctor who provides some treatment may still be held liable *if he possessed a sufficiently culpable mental state*. *See Petties*, slip op. at 12.

It is in this context that we have emphasized the deference owed to the professional judgment of medical personnel. *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013); *see also Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (describing the "'professional judgment' standard"). By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no

reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision. When the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation, summary judgment is unwarranted. *See Petties*, slip op. at 12. ("When a doctor says he did not realize his treatment decisions (or lack thereof) could cause serious harm to a plaintiff, a jury is entitled to weigh that explanation against certain clues that the doctor *did* know."). That evidence may consist of "clues" drawn from the context surrounding a treatment decision. *Id.* And if the defendant's chosen "course of treatment" departs radically from "accepted professional practice," a jury may infer from the treatment decision itself that no exercise of professional judgment actually occurred. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

## B. Dr. Sood's Decision to Delay Zaya's Return to Dr. Bussey

With these standards in mind, we turn to whether Zaya has put forward enough evidence to survive summary judgment. As we've noted, the parties agree that a broken wrist is a serious medical condition. Our only concern is Dr. Sood's failure to comply with Dr. Bussey's instructions that Zaya return in three weeks for a follow-up exam and additional x-rays. Zaya argues that Dr. Sood understood the risks associated with delaying treatment and disregarded those risks by waiting nearly seven weeks to authorize a

follow-up appointment. In support of this claim, Zaya points to Dr. Bussey's instructions themselves.

A jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist. *See Petties*, slip op. at 9; *Gil v. Reed*, 381 F.3d 649, 663–64 (7th Cir. 2004); *Jones v. Simek*, 193 F.3d 485, 490–91 (7th Cir. 1999). The validity of the inference rests primarily on the contemporaneity of the communication and the defendant's decision. Instructions from a specialist are evidence that the defendant knew a particular course of treatment was recommended by at least one other medical professional *at the time* the defendant chose not to provide that treatment.

Dr. Bussey went a step further than simply recommending that Zaya return within three weeks; he actually described the risks of further delay. Dr. Bussey's instructions explained that any displacement of Zaya's wrist could still be fixed "rather easily" at the three-week mark—the clear implication being that it would become more difficult to correct as more time passed. Dr. Sood expressly acknowledged receipt of these instructions by countersigning the copy that was sent to Henry Hill. Given these facts, a jury could conclude that Dr. Sood consciously disregarded the risks associated with delaying Zaya's return to Dr. Bussey. *See Gil*, 381 F.3d at 664 ("On summary judgment, we find that prescribing on three occasions the very medication the specialist warned against … while simultaneously canceling … two of the three prescribed [medications] gives rise to a genuine issue of material fact about [the defendant's] state of mind.").

But Dr. Sood has offered an explanation for his decision to wait nearly seven weeks to send Zaya back to Dr. Bussey:

He claims that he disagreed with Dr. Bussey's treatment plan. In his deposition Dr. Sood explained that he has treated over 500 fractures in his 22-year career and that he believes three weeks is too early to assess if a bone is healing properly. According to Dr. Sood, "[y]ou need up to six to eight weeks to find out the exact nature of the fracture." That explanation distinguishes this case from those in which the defendant either gives no explanation whatsoever for his failure to follow a specialist's instructions, *see, e.g., Jones*, 193 F.3d at 490–91, or provides an explanation that's internally inconsistent or otherwise implausible on its face, *see, e.g., Petties*, slip op. at 16; *Gil*, 381 F.3d at 663–64. Because Dr. Sood has provided a cogent, medical explanation for his decision to delay follow-up treatment, Zaya must point to some evidence that would permit a reasonable jury to reject his explanation as a post hoc rationalization. *Cf. Sain*, 512 F.3d at 895 (granting summary judgment to the defendant doctor because the plaintiff provided "no evidence to show that [the doctor's medical explanation] was a sham or otherwise impermissible").[1]

---

[1] This is not to suggest that courts should make credibility determinations or weigh evidence on a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Jackson v. Ill. Medi–Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002). But summary judgment does require courts to decide what inferences can *justifiably* be drawn from the nonmovant's evidence. *See Liberty Lobby*, 477 U.S. at 249–50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (citations omitted). If a defendant provides a facially plausible medical explanation for his decision and that explanation remains un-rebutted, the jury would have no reason to discredit it.

We think that Zaya has met this requirement—though
just barely—by offering the report and deposition testimony
of Dr. Nathaniel R. Evans, his expert. Dr. Evans opined that
it was unreasonable for Dr. Sood, a general practitioner, to
disagree with instructions from Dr. Bussey, an orthopedic
surgeon who had examined and treated Zaya:

> A reasonable physician, when faced with the
> circumstance of a patient having been treated
> by an orthopedist and having received written
> request from that orthopedist to return the pa-
> tient to the orthopedist in … three weeks,
> would have directed that the patient be re-
> turned to the orthopedist in the three week
> timeframe as specified by the orthopedist. In
> failing to do so, Dr. Sood deviated from the
> standard of care.

From that testimony a reasonable jury could draw the
following conclusions: Most general practitioners wouldn't
disagree with Dr. Bussey's instructions. Dr. Sood is a general
practitioner; therefore, Dr. Sood didn't actually disagree
with Dr. Bussey's instructions.

Of course doctors do sometimes act unreasonably, so the
expert's opinion is only weakly probative of Dr. Sood's
mental state. By itself an expert's assessment that a treatment
decision was unreasonable is not enough to establish con-
scious disregard of a known risk. *See Duckworth*, 532 F.3d at
681. But Zaya has offered more than that; he has provided
evidence that Dr. Sood was fully apprised of the risks asso-
ciated with delaying treatment *at the time* he made the
decision to do so. Given that affirmative evidence of
Dr. Sood's mental state, the expert's opinion is enough to

create a genuine factual dispute about whether Dr. Sood actually disagreed with Dr. Bussey's instructions or instead simply ignored them, notwithstanding the attendant risks.

## C. Qualified Immunity

Dr. Sood contends that even if a jury could find that he consciously disregarded the risks of delaying Zaya's return to Dr. Bussey, he is nonetheless entitled to summary judgment on qualified-immunity grounds. The Supreme Court has held that employees of privately operated prisons may not assert a qualified-immunity defense. *See Richardson v. McKnight*, 521 U.S. 399, 412 (1997). We have construed that holding to extend to employees of private corporations that contract with the state to provide medical care for prison inmates. *See Currie v. Chhabra*, 728 F.3d 626, 631–32 (7th Cir. 2013); *see also Shields v. Ill. Dep't of Corrs.*, 746 F.3d 782, 794 n.3 (7th Cir. 2014). As an employee of Wexford, a private corporation that contracts with the Illinois Department of Corrections, Dr. Sood asks us to reconsider our earlier decisions.

We need not do so because even if a qualified-immunity defense were available to Dr. Sood, he would not be entitled to summary judgment on that basis. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Zaya's deliberate-indifference claim turns on Dr. Sood's mental state, and it is well established what the law requires in that regard. *See Farmer*, 511 U.S. at 837. If Dr. Sood consciously disregarded the risks of delay-

ing Zaya's return to Dr. Bussey, then his conduct violates clearly established law under the Eighth Amendment. *See Petties*, slip op. at 18. As we've explained, that's a question of fact that needs to be resolved by a jury.

REVERSED AND REMANDED.