In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1902

ASHOOR RASHO,

*Plaintiff-Appellant,*

*v.*

WILLARD O. ELYEA, ET AL.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:11-CV-01308 — **Michael M. Mihm**, *Judge.*

ARGUED APRIL 17, 2015 — DECIDED MARCH 7, 2017

Before POSNER and WILLIAMS, *Circuit Judges,* and WOOD, *District Judge.*[*]

WOOD, *District Judge.* Ashoor Rasho arrived at the Pontiac Correctional Center ("Pontiac"), an Illinois prison, in 2003. Rasho has a history of mental illness and, after he stopped taking his medication and began showing escalating symp-

---

[*] Hon. Andrea R. Wood of the Northern District of Illinois sitting by designation.

toms, he was transferred into Pontiac's Mental Health Unit. He remained in the Mental Health Unit until 2006, when he was transferred to the North Segregation Unit. Rasho believes that he was transferred out of the Mental Health Unit not because he no longer required the specialized treatment offered there but instead in retaliation for complaints he had lodged against various prison staff. According to Rasho, after he was transferred, he was denied even minimally adequate mental health care for more than 20 months.

Rasho subsequently filed a lawsuit pursuant to 42 U.S.C. § 1983 against the Pontiac staff psychiatrist and psychology services administrator who recommended his transfer out of the Mental Health Unit, as well as the warden, medical director, and director of mental health, alleging that each acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution.[1] The district court granted summary judgment in favor of all of the defendants. Rasho now appeals.

## I.

Rasho has been an inmate in the custody of the Illinois Department of Corrections ("IDOC") since 1996, although he did not arrive at Pontiac until 2003. He has a history of mental illness—characterized by auditory hallucinations, severe depression, agitation, self-mutilation, and suicide attempts—

---

[1] As explained in the district court's opinion, Rasho's individual action has been separated from the putative class action *Rasho, et al. v. Director Roger E. Walker, Jr., et al.*, Case No. 07-cv-1298 (C.D. Ill.). The present appeal, like the lower court ruling from which it has been taken, addresses only Rasho's individual claims.

for which he has been prescribed psychotropic medications. At various times, he has been diagnosed with the Axis I mental disorders "Major Depressive Disorder, Recurrent, with Psychotic Features or Schizophrenia" and "Major Depressive Disorder with Psychotic Features, Recurrent."[2] While at Pontiac, he also received an Axis I diagnosis of "history of polysubstance abuse and dependence" and an Axis II diagnosis of "antisocial personality disorder and borderline personality disorder." As described by his expert witness in this case, Rasho is a "very, very sick man."

In April 2004, after Rasho stopped taking his medications and began cutting himself, a psychiatrist at Pontiac recommended that he be transferred to the prison's Mental Health Unit. Inmates assigned to that unit have more frequent access to mental health professionals and receive greater continuity of mental health care than those in other prison units. Among the therapeutic benefits available to inmates in the Mental Health Unit are group therapy, cells with open bars, and the ability to have private and confidential conversations with mental health staff more easily. Inmates in the Mental Health Unit also may receive individual therapy, crisis intervention, and psychotropic medication management.

While Rasho was in the Mental Health Unit, he met with mental health professionals at least monthly and was prescribed psychotropic medications. Yet the record reveals that

---

[2] "Axis I" is a classification for clinical disorders recognized in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev. 2000) ("DSM-IV"), published by the American Psychiatric Association and widely recognized as an authoritative source for information about mental conditions. "Axis II" is the DSM-IV's classification for personality disorders.

Rasho still cut himself on approximately five or six occa-sions—including at least twice that resulted in Rasho being placed on crisis watch—and engaged in other disruptive and self-destructive behavior. He complained frequently and acted out while in the Mental Health Unit and filed several grievances regarding Pontiac staff.

Rasho remained in the Mental Health Unit until he was transferred to the North Segregation Unit in November 2006. The transfer was initially recommended by Dr. Michael Massa, who worked as a staff psychiatrist at Pontiac and treated Rasho. The transfer was also approved by Dr. John Garlick, who held the position of Psychology Services Ad-ministrator and was Dr. Massa's supervisor. At the time, Dr. Massa and Dr. Garlick provided mental health services to Pontiac inmates pursuant to the IDOC's contract with pri-vate contractor Wexford Health Sources, Inc. ("Wexford"). Dr. Massa first recommended that Rasho be transferred out of the Mental Health Unit on May 25, 2006; he followed with another recommendation on August 3, 2006. Rasho was eventually transferred in November 2006.

The parties dispute the reason for Dr. Massa's and Dr. Garlick's determination to transfer Rasho out of the Mental Health Unit. Dr. Massa claims that he recommended the transfer because he did not believe that Rasho had a diagno-sis or set of symptoms such that he was benefitting from the placement. Dr. Massa also claims that he had become con-cerned that Rasho's continued presence in the Mental Health Unit would be detrimental to other inmates in the unit—specifically, Rasho was showing signs of antisocial personal-ity disorder that made him a risk to the genuinely mentally ill and vulnerable inmates there. Dr. Garlick claims that he

agreed that Rasho should leave the Mental Health Unit based on his own interactions with Rasho and his knowledge of Rasho's condition and behavior. According to Dr. Garlick, he too was concerned that Rasho's continued presence in the Mental Health Unit would have a detrimental effect on other inmates and he also doubted that Rasho was benefitting from placement there.

Rasho challenges Dr. Massa's and Dr. Garlick's stated reasons for recommending his transfer out of the Mental Health Unit. He contends that they actually decided to have him transferred as punishment for his complaints. In fact, Rasho claims that both Dr. Massa and Dr. Garlick actually told him that he was kicked out of the Mental Health Unit because he filed too many grievances. Rasho also points out that Dr. Massa recommended the transfer even though Dr. Massa was well aware of Rasho's history of mental health problems and continued to prescribe Rasho powerful psychotropic medications after making the recommendation. One of those medications was Geodon, which is primarily used to treat schizophrenia and mania and to provide maintenance for bipolar disorder. If Dr. Massa truly believed that he did not require specialized mental health treatment, Rasho argues, then why would he continue to prescribe medications indicated only for that purpose?

Rasho also has presented testimony from Dr. Jose Matthews, who treated Rasho in the North Segregation Unit, and Dr. Joel Silverberg, an expert witness retained on Rasho's behalf for purposes of this case. Dr. Matthews testified that after treating Rasho for some time in the North Segregation Unit (and initially believing that Rasho might be malingering), he came to believe that Rasho did require

greater care than would be provided in the North Segregation Unit and should be transferred back to the Mental Health Unit. When Dr. Matthews raised the issue, however, Dr. Garlick rejected the idea stating "no, no, no, [Rasho] can't go there."

Similarly, Dr. Silverberg has offered an expert opinion that Rasho should have been kept in the Mental Health Unit and not transferred to the North Segregation Unit, an environment that he considers to have been "toxic" to Rasho's mental health and where there was no meaningful mental health treatment. According to Dr. Silverberg, inmates in the North Segregation Unit were isolated and treated like animals. Moreover, the filth and noise there aggravated Rasho's condition and, because the unit did not have places that allowed Rasho to talk to mental health staff in private, Rasho was forced to downplay his issues. Dr. Silverberg concluded that Rasho was undertreated while at Pontiac but did respond when provided with appropriate care—*i.e.*, beginning no earlier than 2008 (or approximately 20 months after Rasho was transferred), when Dr. Matthews arrived at Pontiac and began paying special attention to Rasho beyond what would otherwise have been provided.

Although it is undisputed that Rasho cut himself both while he was in the Mental Health Unit and after he was transferred, supported by the testimony from Dr. Matthews and Dr. Silverberg, Rasho claims that his mental health deteriorated and his self-mutilation escalated after he was transferred.

Rasho was transferred from Pontiac to Stateville Correctional Center in 2011, but then returned to Pontiac's North Segregation Unit in February 2012. Rasho claims that his

mental health treatment upon his return to Pontiac was very
different than during his prior stint there. The difference was
the attention he received from Dr. Matthews, who began
meeting with Rasho for two hours each week. Rasho charac-
terizes the treatment that Dr. Matthews provided him as ex-
ceptional and not at all typical of the care usually provided
to inmates in the North Segregation Unit. Dr. Matthews has
acknowledged that he initially felt that Rasho might be fak-
ing his symptoms. By the time he left Pontiac in September
2012, however, Dr. Matthews had changed his mind and
recommended that Rasho be transferred to the Mental
Health Unit. As noted above, this recommendation was re-
jected by Dr. Garlick.

Rasho claims in his lawsuit that Dr. Massa and Dr. Gar-
lick acted with deliberate indifference to his serious medical
needs by transferring him out of the Mental Health Unit.
Rasho also has sued three supervisory IDOC staff for their
purported deliberate indifference: Dr. Wendy Blank (origi-
nally named in Rasho's lawsuit under her prior name, Wen-
dy Navarro) served as IDOC's Director of Mental Health be-
ginning in 2006; Dr. Willard Elyea served as IDOC's medical
director from 1999 until April 2007; and finally, Eddie Jones
was Pontiac's warden from 2006 to 2008. Rasho seeks to hold
these defendants liable under a theory that they failed in
their respective duties to take reasonable steps to ensure ad-
equate medical care for seriously mentally ill inmates.

The district court granted summary judgment in favor of
all of the defendants. Focusing on his claim against Dr. Mas-
sa, the district court found that Rasho could not show that he
actually received inadequate care while in the North Segre-
gation Unit. Key to the district court's conclusion was the

opinion from Dr. Silverberg that the care provided to Rasho by Dr. Matthews fell within the appropriate standard of care. As the district court explained, "the importance of [Dr. Silverberg's] testimony is the fact that Rasho was capable of getting 'appropriate and reasonable' treatment while being housed in North Segregation unit. Given this, it is difficult to find that Dr. Massa's recommendation to transfer Rasho to North Segregation would violate the Constitution." The district court went on to express skepticism that Rasho would be able to establish any injury as a result of the alleged constitutional violation, since he self-mutilated both before and after the transfer.

Having concluded that Rasho could not prevail against the medical provider most directly responsible for the decision to transfer him out of the Mental Health Unit, the district court next considered Rasho's claims against Dr. Garlick, Dr. Elyea, Dr. Blank, and Warden Jones. With respect to Dr. Garlick, the district court found that he was even further removed from the transfer decision than Dr. Massa and, in any case, that there was no evidence he knew a transfer from the Mental Health Unit would be detrimental to Rasho's mental health. With respect to Dr. Elyea and Dr. Navarro, who were even further removed from the transfer decision than Dr. Garlick, the district court concluded that there was no evidence their actions caused any harm to Rasho in particular. Finally, the district court held that the record could not support a finding that Warden Jones failed to comply with any duty by not preventing Rasho from being transferred out of the Mental Health Unit into the allegedly terrible conditions of the North Segregation Unit.

**II.**

We review the district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to Rasho and drawing all inferences in his favor. *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

It is well-established that prison officials and medical staff violate the Eight Amendment's prohibition on cruel and unusual punishment when they act with deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *Chatham v. Davis*, 839 F.3d 679, 684 (7th Cir. 2016). "To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual was deliberately indifferent to that condition." *Petties*, 836 F.3d at 727–28 (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)).

For purposes of summary judgment, the defendants conceded below that whether Rasho suffered from an objectively serious medical condition constitutes a triable issue of fact for a jury to decide. And so the question to be determined here is whether Rasho has produced sufficient evidence to permit a jury to find that any of the defendants were deliberately indifferent to his condition.

Deliberate indifference requires that a defendant actually know about yet disregard a substantial risk of harm to an inmate's health or safety. *Petties*, 836 F.3d at 728. "The standard is a subjective one: The defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the inference." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). Emphasizing the deference owed to the professional judgment of medical providers, we have observed that "[b]y definition a treatment decision [that is] based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Id.* at 805; *see also McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013); *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008). "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain*, 512 F.3d at 895 (internal quotation marks omitted).

The defendants would like us to view the decision to transfer Rasho out of the Mental Health Unit as an exercise of medical judgment entitled to judicial deference. But Rasho claims that Dr. Masso and Dr. Garlick did not exercise medical judgment *at all* in deciding to recommend that he be transferred. Instead, Rasho contends, their decision was motivated by spite: they sought to have him transferred in retaliation for his several grievances against prison staff and medical personnel.

In *Petties*, we recognized that the choice of "an easier and less efficacious treatment without exercising professional judgment" can constitute deliberate indifference. 836 F.3d at 730 (internal quotation marks omitted). Most often, this concern arises when a medical provider is alleged to have chosen a treatment—or lack thereof—based on cost considerations rather than medical judgment. *See, e.g.*, *Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011) ("Although administrative convenience and costs may be, in appropriate circumstances, permissible factors for correctional systems to consider in making treatment decisions, the Constitution is violated when they are considered to the exclusion of reasonable medical judgment about inmate health." (emphasis omitted)); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The cost of treatment alternatives is a factor in determining what constitutes adequate, minimum-level medical care, but medical personnel cannot simply resort to an easier course of treatment that they know is ineffective." (citations omitted)). But a similar concern arises if a medical provider bases his or her treatment decision on personal prejudices or animosity. In either circumstance, the medical provider may violate the patient-inmate's constitutional rights by failing to exercise medical judgment at all. *See Roe*, 631 F.3d at 863.

Rasho here has put forward sufficient evidence from which a reasonable jury could decide that Dr. Massa and Dr. Garlick caused him to be transferred out of the Mental Health Unit for reasons that had nothing to do with medical judgment. Such evidence includes Rasho's own testimony that Dr. Massa and Dr. Garlick each explicitly told him that he was transferred in response to his complaints. The district court discounted Rasho's testimony on this point as not

sufficiently unequivocal in its language. But Rasho's credibility and the weight to be afforded his testimony is a matter for a jury to decide. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]"). Together with his mental health history, the continued prescription of psychotropic medications after his transfer, the testimony from Dr. Matthews regarding his need for mental health treatment and Dr. Garlick's refusal to allow him to return to the Mental Health Unit, and Dr. Silverberg's expert testimony, Rasho's testimony is sufficient to create a disputed issue of material fact regarding whether Dr. Massa and Dr. Garlick recommended the transfer as retaliation rather than as a matter of medical judgment.

Furthermore, we reject the suggestion that a reasonable jury could not find that Dr. Massa and Dr. Garlick acted in retaliation for Rasho's grievances simply because those grievances were directed toward other Pontiac staff members. To the contrary, a reasonable inference to be drawn from the evidence could be that Dr. Massa and Dr. Garlick were motivated either to punish Rasho for his complaints against their colleagues or by a desire to remove a troublemaking inmate before they became the next targets of his complaints.

In addition, drawing all reasonable inferences from the evidence in Rasho's favor, a jury could conclude that Rasho was harmed as a result of his transfer out of the Mental Health Unit. The district court expressed skepticism that such a causal connection could be proved. But a jury could

agree with Dr. Silverberg that being transferred out of the Mental Health Unit increased the risk that Rasho's mental condition would deteriorate, leading to self-mutilation and other self-destructive behavior. That Rasho was capable of getting appropriate and reasonable treatment while in the North Segregation Unit is not dispositive where a jury could find that to have been the case only due to an extraordinary effort by Dr. Matthews.

As an alternative basis for its grant of summary judgment in favor of Dr. Massa, the district court concluded that Rasho's claim is barred by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(e), because he cannot present evidence of a physical injury. Section 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." 42 U.S.C. § 1997e(e). The district court found that Rasho could not present evidence of a physical injury resulting from his transfer out of the Mental Health Unit and therefore his claim is barred. But Rasho did present evidence of at least one undisputed incident of self-mutilation. That incident is sufficient to satisfy the physical harm requirement. And as discussed above, Rasho has demonstrated that there is a triable issue of fact regarding whether that harm is attributable to the increased risk to his mental health resulting from his transfer.

Even if Rasho were unable to point to any physical injury, the lack of such an injury would not bar his claim but rather merely limit the damages he could recover: if Rasho proved his claim, he would still be able to recover nominal

and punitive damages. *Gray v. Hardy*, 826 F.3d 1000, 1007 (7th Cir. 2016); *Calhoun v. Detella*, 319 F.3d 936, 941–42 (7th Cir. 2003). Thus the district court erred in suggesting that the lack of a physical injury provided an independent basis to grant summary judgment in Dr. Massa's favor.

## III.

As noted above, in addition to Dr. Massa and Dr. Garlick, Rasho also sued three defendants with more tenuous connections to his mental health treatment: Dr. Elyea, Dr. Blank, and Warden Jones. Specifically, Rasho sought to hold Dr. Elyea accountable for his alleged failure to supervise properly the contract between IDOC and its medical provider, Wexford; he asserted a claim against Dr. Blank based on the allegation that she knew the mental health staff at Pontiac was less than half as large as needed to provide adequate care for its inmates and that Wexford's psychiatrists were not working enough hours to comply with their contractual requirements; and finally, he sued Warden Jones based on the theory that, as the prison official in charge of ensuring proper implementation of the policies and procedures established by IDOC's Director of Mental Health, Warden Jones was ultimately responsible for the decision to transfer him from the Mental Health Unit to the North Segregation Unit.

But in order to hold an individual defendant liable under § 1983 for a violation of an inmate's constitutional rights, the inmate must show that the defendant was personally responsible for that violation. *Childress v. Walker*, 787 F.3d 433, 439 (7th Cir. 2001); *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). "A defendant will be deemed to have sufficient personal responsibility if he directed the conduct

causing the constitutional violation, or if it occurred with his knowledge or consent." *Sanville*, 266 F.3d at 740 (internal quotation marks omitted). While the defendant need not have participated directly in the deprivation of the plaintiff's constitutional right to be held liable, he or she must nonetheless have "'know[n] about the conduct, facilitate[d] it, approve[d] it, condone[d] it, or turne[d] a blind eye for fear of what they might see.'" *Matthews v. City of East St. Louis*, 675 F.3d 793, 708 (7th Cir. 2012) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988)).

As the district court correctly concluded, Rasho has presented no evidence to show that any of Dr. Elyea, Dr. Blank, or Warden Jones was personally responsible for the decision to transfer him out of the Mental Health Unit or otherwise to connect the alleged conduct of those defendants to the deficient mental health care he claims to have received after that transfer. There is no evidence, for example, that Dr. Elyea's alleged failure to supervise properly Wexford's contract or Dr. Blank's alleged failure to promulgate protocols led to Rasho's transfer or caused him any harm. Nor is there any evidence that Warden Jones knew about, facilitated, approved, condoned, or turned a blind eye toward the psychiatric staff's purported decision to punish Rasho by transferring him out of the Mental Health Unit.

Rasho also has failed to put forward any facts suggesting that Dr. Elyea, Dr. Blank, or Dr. Jones had any reason to doubt that Dr. Massa and Dr. Garlick based their recommendations on anything other than medical judgment. Prison officials generally are entitled to rely on the judgment of medical professionals treating an inmate, *see Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 676 (7th Cir. 2012)

(noting that "jail officials ordinarily are entitled to defer to the judgment of medical professionals"); *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (noting that non-medical prison officials can rely on the expertise of medical personnel and will generally be justified in believing that the prisoner is in capable hands). While Dr. Elyea and Dr. Blank were themselves medical professionals who might ordinarily be held to a different standard than a non-medical prison official, in this case Rasho seeks to hold Dr. Elyea and Dr. Blank accountable as prison administrators and policymakers, not treaters. Rasho has not presented evidence that either of them should have realized that something was amiss with Dr. Massa's and Dr. Garlick's transfer recommendation. Accordingly, the grant of summary judgment in their favor was appropriate as well.

## IV.

As the district court found that Rasho could not show that any of the defendants acted with deliberate indifference to his serious medical needs, the court did not reach the issue of qualified immunity. But in light of our determination that the district court erred in granting summary judgment on that basis as to Dr. Massa and Dr. Garlick, the qualified-immunity defense warrants some discussion.

This Court has construed the Supreme Court's holding that employees of privately-operated prisons may not assert a qualified-immunity defense also to deny that defense to employees of private corporations that contract with the state to provide medical care for prisoners. *Zaya*, 836 F.3d at 807 (citing *Richardson v. McKnight*, 521 U.S. 399, 412, 117 S. Ct. 2100, 138 L. Ed. 2d 540 (1997)). Thus, Dr. Massa and Dr.

Garlick, as employees of the private contractor Wexford, cannot assert qualified immunity as a defense to Rasho's claims. *See Petties*, 836 F.3d at 734 ("[Q]ualified immunity does not apply to private medical personnel in prisons.") (citing *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 794 (7th Cir. 2014)); *see also Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) (citing with approval the Sixth Circuit's holding in *McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012), that "a [private] doctor providing psychiatric services to inmates at a state prison is not entitled to assert qualified immunity").

But even if a qualified-immunity defense were available to them, it would be inappropriate to award summary judgment in Dr. Massa's and Dr. Garlick's favors on that basis while such threshold factual questions as their states of mind remain disputed. *See Petties*, 836 F.3d at 734; *see also Zaya*, 836 F.3d at 807 (finding summary judgment on a qualified-immunity defense inappropriate because the plaintiff's claim turned on the defendant's mental state and "it is well established what the law requires in that regard"). If Dr. Massa and Dr. Garlick denied Rasho mental health treatment to retaliate against him for his grievances, then their conduct violates clearly-established law under the Eighth Amendment. For reasons we have discussed above, that is a question of fact for the jury to decide.

## V.

For the reasons stated above, we AFFIRM the district court's grant of summary judgment in favor of Defendants Elyea, Blank, and Jones, but REVERSE the grant of summary judgment in favor of Defendants Massa and Garlick. This case is REMANDED for further proceedings.