In the

# United States Court of Appeals

## For the Seventh Circuit

───────────────

No. 22-1585

VICTOR R. BROWN,

*Plaintiff-Appellant,*

*v.*

DANIEL LAVOIE,

*Defendant-Appellee.*

───────────────

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:20-cv-00319 — **Lynn Adelman**, *Judge.*

───────────────

ARGUED SEPTEMBER 19, 2023 — DECIDED JANUARY 23, 2024

───────────────

Before EASTERBROOK, WOOD, and KIRSCH, *Circuit Judges.*

WOOD, *Circuit Judge.* Victor Brown, an inmate in the Wisconsin Department of Corrections, has a history of self-harm. One morning while he was particularly upset, Brown forced a two-inch metal screw into his own flesh by his left elbow. The screw was embedded so deeply that it could not be seen without manipulating the skin, and so a prison nurse called the prison doctor, Daniel LaVoie, to extract it.

Dr. LaVoie twice tried, and twice failed, to extract the screw using a pair of metal-ring forceps. He did so without using any anesthetic to deaden the site. When he first informed Brown that this would be his approach, Brown protested by attempting to head-butt him. During the second attempt, Dr. LaVoie again refused to apply an anesthetic, even though Brown's pain was obvious. The doctor poked at Brown's arm and tried to pull on the screw for several minutes as Brown shouted in pain. He paused only to make dismissive comments, such as telling Brown that he needed to change his attitude. Eventually Brown was taken to a local hospital, where staff administered an anesthetic and removed the screw painlessly and quickly.

In this lawsuit, Brown claims that Dr. LaVoie was deliberately indifferent to his serious medical condition in violation of the Eighth Amendment. The district court granted summary judgment to Dr. LaVoie. Although it was willing to assume that Brown had a serious medical condition, it concluded that Dr. LaVoie was not deliberately indifferent to that condition and thus did not violate Brown's Eighth Amendment rights. For good measure, the court added that in any event Dr. LaVoie was entitled to qualified immunity. We see things differently. When we view the record in the light most favorable to Brown, as we must, there is a genuine dispute of material fact about Dr. LaVoie's state of mind. We therefore reverse and remand for further proceedings.

**I**

A closer look at the record helps to explain why summary judgment on both those grounds was premature. Brown alleges that around noon on August 21, 2019, two prison supervisors were called to his cell after he had an altercation with

an official. The cell window was covered with a towel when they arrived. Brown informed them that he had removed the mirror from the cell wall; he banged it against the door as proof. The supervisors asked Brown to remove the towel from his window, but he did not immediately do so. Instead, Brown swallowed six pieces of metal and inserted a two-inch metal screw from the mirror into his flesh at the crook of his left elbow. He then removed the towel and told the supervisors what he had done.

More prison officials arrived after Brown agreed to come out of his cell. They handcuffed Brown, placed a spit-guard over his mouth, strapped him into a restraint chair, and took him to a nurse's station in the prison. The nurse inspected Brown's inner left elbow and determined that Brown needed to see a doctor. In a video recording of the incident, the nurse can be heard saying, "I gotta call a doctor. … I can feel it in there … but I can't even see it."

Still strapped into the restraint chair, Brown was brought to a hearing room, where he sat for over half an hour. Several officials approached him during that time. Brown indicated to the first that he would not allow the prison doctor to remove the screw. A second official told Brown that he would be kept in restraints until the screw was removed. This official suggested that Brown should permit the doctor to remove it so that he could go to bed. Brown eventually agreed to see the doctor, at which point he was carted back to the nurse's station.

Dr. LaVoie was waiting at the station when Brown arrived. He studied Brown's inner elbow from a short distance and then drew a pair of metal-ring forceps from a sterile bag. As Dr. LaVoie bent down to extract the screw with the tool,

Brown asked whether anesthetics would be used to numb the site. Dr. LaVoie said "No." Frightened, Brown immediately reacted by attempting to head-butt the doctor. Dr. LaVoie quickly backed away, but before leaving the station, he said to Brown: "Well, maybe you deserve to be strapped down in the bed."

Video from the incident shows that the officials next took Brown to a cell and strapped him into a restraint bed. They secured Brown's torso with belts across his chest and legs, and restricted his limbs by fastening his upper arms, wrists, and ankles to the bed. Brown believed that he would remain strapped down until the screw was removed, and so he eventually agreed to see the doctor again. When Dr. LaVoie entered the cell to make a second attempt at removal, Brown specifically said, through the spit-guard, "I want you to use anesthesia." Dr. LaVoie replied, "No. You stuck a screw in your arm, not me, and this is a consequence of your actions."

This time, Dr. LaVoie worked at Brown's arm for nearly five minutes. Prison officials stood around Brown to help the doctor; some of them prevented Brown from raising his neck so that he could see his arm. Brown had several dissociative experiences, and within 90 seconds, his arm started bleeding—so much so that an official requested a trash can "for the bloody stuff." The video recording of the incident shows that as Brown shouted in pain, Dr. LaVoie responded with dismissive comments, and a tone of annoyance, perhaps even sarcasm. The following is a partial transcription of what was said:

> **Brown**: Alright, I need a break. I need a break. Break. Ow, you fucker! I need a break!

**Dr. LaVoie**: This is—this is not something *I* did. Do you understand that—Mr. Brown?

**Brown**: You got a real slick attitude, huh?

**Dr. LaVoie**: Yeah, well, your attitude is the one that needs to change.

…

**Brown**: Can't you just—pull it out?

**Dr. LaVoie**: Well, you didn't put it in right.

**Brown**: Ow!

**Dr. LaVoie**: You put it in so it's hard to get out. So next time, don't do that.

…

**Brown**: I don't like that. I don't want [indiscernible]

**Dr. LaVoie**: You don't want what?

**Brown**: I can't go—I can't keep going on like that.

**Prison Official**: He's close.

**Brown**: No, he's not! It's not even on the surface!

**Dr. LaVoie**: I thought he was agreeing to have this done.

**Prison Official**: He did agree.

…

**Brown**: Stop! STOP! STOP!! You bitch! I'm refusing!

Even after Brown begged Dr. LaVoie to stop, the doctor persisted in poking in Brown's arm for another few seconds. Brown then shouted, "Why do you keeping digging in my arm?" Dr. LaVoie finally gave up, stood, and said to Brown: "No. You know what? It can stay there. That's fine." He wiped the ring forceps and left the cell.

Brown fell asleep in the restraint bed, where he remained (still strapped in) for nearly four hours until he was taken to a local hospital, accompanied by three officials. The hospital staff "deemed it obvious" that local anesthesia was required for the procedure, and after administering an anesthetic they painlessly removed the screw in under three minutes.

## II

Invoking 42 U.S.C. § 1983, Brown filed this lawsuit against Dr. LaVoie, who, he asserted, had acted with deliberate indifference toward Brown's serious medical condition in violation of the Eighth Amendment. Brown also contended that several other prison officials had violated the Eighth Amendment by failing to intervene to stop Dr. LaVoie. The latter claims have all been resolved, and so we say no more about them.

Along with his complaint, Brown filed a motion to recruit counsel pursuant to 28 U.S.C. § 1915(e)(1). The district court denied this request, both initially and on reconsideration. After the district court issued a screening order, Brown renewed his request for counsel. This time he attached to the motion the letters he sent to 24 attorneys seeking assistance with his case. In the motion itself, Brown explained that he suffers from several mental illnesses and a documented learning disability, all of which affect his ability to engage in this

litigation; that although he is 28 years old, he has completed school through only the eighth grade and has not earned a GED; and that he relies on the assistance of other prisoners to conduct his case. The district court denied this request as well.

Dr. LaVoie then moved for summary judgment. He argued that Brown could not succeed on the merits of his Eighth Amendment claim and that even if Brown cleared that hurdle, Dr. LaVoie was entitled to qualified immunity. The doctor submitted a short declaration to support his motion. His account was similar to the one from Brown that we have described above, but there are some differences. Dr. LaVoie stated that when he first tried to remove the screw, Brown asked whether he would use an anesthetic, and Dr. LaVoie said no. Brown's version to this point is the same. Brown then attempted to head-butt him—something Brown concedes that he did. Dr. LaVoie said that in response to the head-butt, he paused the treatment; Brown agrees that the doctor backed off then. Brown adds, however, that as Dr. LaVoie left, he commented that "maybe [Brown] deserve[d] to be strapped down in the bed."

Both parties agree that Dr. LaVoie tried again to remove the screw. Brown adds that he specifically asked Dr. LaVoie to use anesthesia before the second attempt, but that Dr. LaVoie refused. The only explanation he gave, according to Brown, was that Brown had "stuck a screw in [his] arm" and that "this [was] a consequence of [his] actions." Both sides agree that Dr. LaVoie stopped after about five minutes, shortly after Brown shouted that he revoked his consent. Dr. LaVoie did not explain his chosen course of treatment, why he continued it as Brown shouted in pain, or what he meant by saying essentially that Brown deserved the pain.

The district court granted summary judgment in favor of Dr. LaVoie. In so doing, it found that no rational trier of fact could conclude that Dr. LaVoie's decision not to use anesthesia and his wielding of the forceps inside Brown's flesh amounted to deliberate indifference. The court thought that this conclusion followed from *Snipes v. DeTella*, 95 F.3d 586 (7th Cir. 1996), a case in which we held that a prison doctor did not violate the Eighth Amendment by removing a broken toenail without applying topical anesthesia. The court acknowledged that the removal of a screw "may have been more invasive than the removal of a toenail," but it reasoned that the attempted screw removal "was not a 'major surgery' that 'obviously' required some form of anesthetic." As an alternative basis for summary judgment, the district court concluded that Dr. LaVoie was entitled to qualified immunity. This was so, the court said, because in light of *Snipes*, Brown had no clearly established right to an anesthetic.

At this stage of the appeal, Brown challenges the district court's judgment in favor of Dr. LaVoie. In an earlier order, we affirmed the district court's rulings on other aspects of the case, but we recruited counsel to assist with Brown's claim against Dr. LaVoie.[1] See *Brown v. LaVoie*, No. 22-1585, 2023 WL 154798 (7th Cir. Jan. 11, 2023). The remaining issues before us are whether Dr. LaVoie was entitled to summary judgment and whether the district court abused its discretion by not recruiting counsel to assist Brown with this claim. Because we reverse on the first ground, we have no need to reach the second.

---

[1] We thank Madeline Clark and the firm of Jones Day for their assistance to Brown and to the court.

## III

As we already have noted, we review the district court's order awarding summary judgment *de novo*, construing the record in the light most favorable to Brown and drawing all reasonable inferences in his favor. See *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015).

The Eighth Amendment to the United States Constitution lies at the center of this case. Among other things, it protects prisoners from being subjected to "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). That proscription includes "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (*en banc*). The parties do not dispute that Brown suffered from an objectively serious medical condition, and so we need only determine whether a reasonable trier of fact could conclude that Dr. LaVoie was deliberately indifferent to Brown's condition.

### A. **Deliberate Indifference**

The deliberate-indifference standard of the Eighth Amendment mirrors the recklessness standard of the criminal law. See *Rivera v. Gupta*, 836 F.3d 839, 842 (7th Cir. 2016). In order to state a deliberate-indifference claim against a prison doctor, it is thus not enough to show "mere" negligence in treating a serious medical condition. See *Estelle*, 429 U.S. at

105–06. At the same time, a plaintiff does not bear the burden of showing that a doctor intentionally denied necessary treatment. See *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999).

The key question is whether the record contains the requisite evidence of a culpable mental state on the doctor's part. "[T]he prison official must act or fail to act despite his knowledge of a substantial risk of serious harm." *Gil v. Reed*, 382 F.3d 649, 664 (7th Cir. 2004) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). We apply this standard both when a plaintiff claims that a doctor provided no medical treatment, and when the claim is that the doctor provided inadequate treatment. Indeed, we have stressed that "[a] doctor who provides some treatment may still be held liable if he possessed a sufficiently culpable mental state." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) (citing *Petties*, 836 F.3d at 729–30) (emphasis omitted).

We also have emphasized the importance of deferring to the professional judgment of medical personnel. See, *e.g.*, *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008). This is because "[a] doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state." *Zaya*, 836 F.3d at 805. Even then, however, a doctor is entitled to summary judgment only "if no reasonable jury could discredit that claim." *Id.*

We have identified several prototypical situations in which a jury might discredit a prison doctor's proffered justification for his chosen course of treatment. See generally *Petties*, 836 F.3d at 729–31. It is not necessary to restate each of them here; it is enough to note just one. Where a plaintiff puts forward evidence that a doctor failed to exercise medical judgment, it is for the jury to decide whether the doctor had a

sufficiently culpable mental state. See *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017) (citing *Petties*, 836 F.3d at 730). A plaintiff may show a lack of professional judgment by introducing evidence of some other motive for the doctor's chosen course of action, such as hostility or ill-will towards the plaintiff. See *Rivera*, 836 F.3d at 842; *Rasho*, 856 F.3d at 476.

Brown has put forward sufficient evidence to raise a material question about Dr. LaVoie's state of mind. Both Dr. La-Voie's own statements and his troublesome course of treatment could support a finding of deliberate indifference. The record shows that Dr. LaVoie viewed the procedure as a "consequence" of Brown's behavior, and that he persisted in his efforts to remove the screw without applying anesthesia as Brown shouted in pain and pleaded for an end to it. As Dr. LaVoie continued to root around with the ring forceps in an effort to grab the screw embedded in Brown's arm, he told Brown that he needed a change of attitude, reminded him that it was his own fault the screw was in his arm, and blamed him for inserting it in a way that made removal more challenging. These comments could be interpreted as signs of annoyance, if not hostility. Some of them come across as sarcastic (or so a jury could find). And in addition to Dr. LaVoie's behavior throughout the procedure, the record shows that Dr. LaVoie persisted in his unsuccessful efforts to remove the screw (which took longer than the hospital's successful procedure) and thereby callously prolonged Brown's pain.

Taking the record evidence in the light most favorable to Brown, a jury could find that medical judgment did not motivate Dr. LaVoie's chosen course of treatment. First, the fact that Brown had tried to head-butt Dr. LaVoie supports the inference that the doctor wanted to inflict pain upon Brown in

retaliation for Brown's action; similarly, a jury could see the doctor's response as based on "personal hostility," *Rivera*, 836 F.3d at 842, or "personal prejudices or animosity," *Rasho*, 856 F.3d at 476. In addition, a reasonable jury could infer from the content and tone of his comments that Dr. LaVoie chose not to use anesthesia because he intended to punish Brown for inserting the screw into his elbow in the first place. Looking at Dr. LaVoie's statement to Brown that he needed to change his attitude, a jury might infer that the doctor persisted without anesthesia to deter Brown from engaging in similar acts of self-harm in the future. If any non-medical reasons of this kind motivated the doctor's judgment, then that would be a basis for a finding of deliberate indifference. (It should go without saying, but we add in the interest of completeness, that a rational jury might equally reject these inferences and find in Dr. LaVoie's favor.)

Our conclusion is reinforced by the fact that Dr. LaVoie has offered no evidence that he did exercise medical judgment in attempting to remove the screw from Brown's arm. His declaration in support of summary judgment was limited to a brief statement of what happened. Nothing in it suggests that he exercised professional judgment either in his assessment of the need for anesthesia or in his decision to use the forceps for a screw buried so far in the flesh that the nurse could not even see it. While the failure to present such evidence is not necessarily dispositive at the summary judgment stage, its absence here is striking because it is "common sense" that pulling a screw from Brown's flesh without anesthesia could carry a substantial risk of harm. *Gil*, 385 F.3d at 662; see also *Petties*, 836 F.3d at 729. But even if Dr. LaVoie were to introduce evidence that he exercised medical judgment, his state of mind would remain a question for the jury. Evidence to that effect

would merely contribute to the existing dispute about Dr. La-Voie's motivation, and so his credibility and the weight to assign his testimony would be matters for the jury to decide. See *Rasho*, 856 F.3d at 476–77 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

As we noted earlier, the district court felt itself bound by our decision in *Snipes*, where we held that a prison doctor who decided not to anesthetize an inmate's toe before removing a partially torn-off toenail did not act with deliberate indifference. See 95 F.3d at 591. The district court took *Snipes* to mean that a prison doctor need not apply an anesthetic when performing a minor surgery. And because removing a screw from the arm is not major surgery, the court reasoned, Dr. La-Voie did not act with deliberate indifference when he chose not to anesthetize Brown's arm. Dr. LaVoie, both in the district court and on appeal, relies on the same understanding of *Snipes*.[2]

But *Snipes* does not establish a rigid rule about the use of anesthesia, much less a rule about the line between major and minor surgery. As an initial matter, it is a far cry between the removal of a torn toenail and the extraction of a two-inch screw embedded beneath the surface of the arm. And once we look beyond the nature of the injury to the reasoning that supported *Snipes*, that case becomes increasingly inapposite. In *Snipes*, there was no question about the doctor's motivation; the doctor was understood to have exercised his medical judgment, and the only issue before us was whether his decision not to administer an anesthetic conformed to

---

[2] Dr. LaVoie withdrew his arguments on the merits of Brown's Eighth Amendment claim, and so we do not elaborate upon them here.

contemporary medical expertise and practices. As we have noted before, *Snipes* was based on the determination that "reasonable medical minds may differ over the appropriate treatment for" removing a busted toenail. *King v. Kramer*, 680 F.3d 1013, 1019 (7th Cir. 2012). The doctor had to weigh the risks of using anesthesia (including the possibility "that an injection of anesthetic would have hurt more than quickly removing the nail") in light of the benefits of doing so. *Snipes*, 95 F.3d at 591–92. Given the prevailing medical practices of that time, we determined that the balance could tip either way. Here, by contrast, the issue is whether Dr. LaVoie exercised any medical judgment, and there was no evidence at all indicating that he weighed the risks and benefits of using anesthesia for the extraction procedure. Our decision here is thus entirely consistent with *Snipes*.

## B. Qualified Immunity

Dr. LaVoie argues that even if he was deliberately indifferent to Brown's condition, he is nonetheless entitled to summary judgment on qualified-immunity grounds. The district court agreed. But qualified immunity is not a basis for summary judgment here.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). We already have noted that Brown's Eighth Amendment claim turns on Dr. LaVoie's state of mind. If, in attempting to remove the screw as he did, Dr. LaVoie was motivated by a desire to punish Brown or otherwise inflict or prolong pain, then his conduct violated

clearly established law under the Eighth Amendment. See, *e.g.*, *Gil*, 381 F.3d at 661–62. Whether that (or something else) was Dr. LaVoie's motive, is a question that only a jury may resolve.

## IV

As we noted at the outset, Brown also challenges the district court's denial of his second motion for recruited counsel. Given our decision on the deliberate-indifference element, we need not decide whether that denial amounted to an abuse of discretion. But on remand we encourage the district court to consider whether it might now be appropriate to recruit counsel to assist Brown. Cases involving state-of-mind requirements may be difficult for *pro se* litigants, see, *e.g.*, *Pruitt v. Mote*, 503 F.3d 647, 655–56 (7th Cir. 2007) (*en banc*), and the considerations that inform whether to recruit counsel often change as a case progresses toward discovery or a trial, see, *e.g.*, *Perez v. Fenoglio*, 792 F.3d 768, 785 (7th Cir. 2015). We are confident that the district court will revisit that decision on remand with Brown's circumstances in mind.

The judgment of the district court is REVERSED and Brown's case against Dr. LaVoie is REMANDED for further proceedings consistent with this opinion.

KIRSCH, *Circuit Judge*, concurring in the judgment. I agree with the result. In reaching that result, the majority focuses on Dr. LaVoie's comments to Brown, which a jury could view as dismissive, annoyed, or sarcastic. But we need not look to these comments at all. Instead, I would find a genuine dispute of material fact because the hospital staff "deemed it obvious" that Brown required anesthesia for the screw removal, and Dr. LaVoie has offered no explanation whatsoever for his refusal to administer anesthesia. Considering only this evidence, a jury could find that Dr. LaVoie was deliberately indifferent to Brown's serious medical needs because his treatment decision was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (quotation omitted). For this reason, I agree that the district court's grant of summary judgment should be reversed.